1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOAN KILLEEN
   Deputy Attorney General
6  State Bar No. 111679
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
     Telephone: (415) 703-5968
8  Fax: (415) 703-1234
     Email: Joan.Killeen@doj.ca.gov
9  Attorneys for Respondent

10         IN THE UNITED STATES DISTRICT COURT

11       FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              SAN JOSE DIVISION

13
   **DERRAN SMILEY,**                        C 08-0045 RMW (PR)
14
                              Petitioner,
15
            **v.**
16
   **MIKE EVANS, Warden,**
17
                              Respondent.
18

19
         **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**
20

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOAN KILLEEN
   Deputy Attorney General
6  State Bar No. 111679
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
     Telephone: (415) 703-5968
8    Fax: (415) 703-1234
     Email: Joan.Killeen@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13
   DERRAN SMILEY,                           C 08-0045 RMW (PR)
14
                             Petitioner,    **ANSWER TO PETITION FOR
15                                          WRIT OF HABEAS CORPUS**

16        v.

   MIKE EVANS, Warden,
17
                             Respondent.
18

19        Respondent provides this Answer to the Petition for Writ of Habeas Corpus:

20                                  I

21                              <u>CUSTODY</u>

22        Petitioner, Derran Smiley, is lawfully in state custody pursuant to the 2006 judgment for

23  conviction of kidnapping to commit rape and rape (five counts), with findings that petitioner

24  kidnapped the victim and that the movement substantially increased the risk of harm to the victim

25  over and above the level of harm inherent in the commission of the offense, and that the rapes were

26  committed against the same victim on separate occasions, Cal. Penal Code §§ 209(b)(1), 261(a)(2),

27  667.61(d)(2), 667.6(c), (d), for which he was sentenced to 25 years to life consecutive to 24 years

28  by the Alameda County Superior Court.

II

## EXHAUSTION OF STATE REMEDIES

Petitioner has exhausted his state remedies with respect to the claims raised in his petition.

III

## STATEMENT OF FACTS AND PROCEDURE

Respondent incorporates by reference the statement of facts and procedure contained in the accompanying memorandum of points and authorities in support of the answer.

IV

## DENIAL OF CLAIMS

Respondent denies that petitioner's federal constitutional rights were violated in any way. Specifically, respondent denies that petitioner's right to due process was violated by the jury's findings as to the charge of kidnapping and the kidnapping special allegations, by the trial court's admission of uncharged conduct evidence, and by the trial court's instructions, and that his Sixth Amendment right to the effective assistance of counsel was violated by counsel's failure to object to evidence.

V

## AVAILABLE TRANSCRIPTS AND RECORDS

Attached are relevant portions of the Clerk's Transcripts and the Reporter's Transcripts of the trial, together with other relevant records, as indicated in the Index of State Court Records Lodged in Support of Answer, incorporated herein by reference.

VI

## GENERAL DENIAL

Except as otherwise admitted, respondent denies each and every allegation of the petition which, if found true, would form the basis of federal habeas relief.

1    WHEREFORE, respondent respectfully requests that the petition for writ of habeas corpus

2  be denied.

3          Dated:  August 7, 2008

4                              Respectfully submitted,

5                              EDMUND G. BROWN JR.
                               Attorney General of the State of California

6                              DANE R. GILLETTE
                               Chief Assistant Attorney General
7
                               GERALD A. ENGLER
8                              Senior Assistant Attorney General

9                              PEGGY S. RUFFRA
                               Supervising Deputy Attorney General

10

11                             /s/ Joan Killeen
                               JOAN KILLEEN
12                             Deputy Attorney General

13                             Attorneys for Respondent

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Answer To Petition For Writ Of Habeas Corpus - C 08-0045 RMW (PR)

3

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOAN KILLEEN
   Deputy Attorney General
6  State Bar No. 111679
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
      Telephone: (415) 703-5968
8  Fax: (415) 703-1234
      Email: Joan.Killeen@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14   **DERRAN SMILEY,**                         C 08-0045 RMW (PR)

15                              Petitioner,

16          **v.**

17   **MIKE EVANS, Warden,**

18                              Respondent.

19
     **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO**
20            **PETITION FOR WRIT OF HABEAS CORPUS**

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
Attorney General of the State of California
2  DANE R. GILLETTE
Chief Assistant Attorney General
3  GERALD A. ENGLER
Senior Assistant Attorney General
4  PEGGY S. RUFFRA
Supervising Deputy Attorney General
5  JOAN KILLEEN
Deputy Attorney General
6  State Bar No. 111679
  455 Golden Gate Avenue, Suite 11000
7  San Francisco, CA 94102-3664
  Telephone: (415) 703-5968
8  Fax: (415) 703-1234
  Email: Joan.Killeen@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

| | |
|---|---|
| **DERRAN SMILEY,** | C 08-0045 RMW (PR) |
| Petitioner, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** |
| **v.** | |
| **MIKE EVANS, Warden,** | |
| Respondent. | |

19      In its Order to Show Cause, this Court identified petitioner's claims for relief as: "(1)

20  there was insufficient evidence to support the kidnap conviction and the true finding on the kidnap

21  enhancement allegations under Penal Code § 667.61(D)(2) which deprived him of due process; (2)

22  he was denied due process and a fair trial when uncharged conduct evidence was admitted against

23  him pursuant to Evidence Code § 1108; (3) CALJIC No. 2.62 violated his Fifth Amendment right

24  against self-incrimination; (4) CALJIC No. 2.50.01 deprived him of due process by misstating the

25  burden of proof necessary for a conviction; (5) ineffective assistance of counsel by counsel's failure

26  to object to the use of rape trauma syndrome evidence as substantive evidence of guilt; and (6)

27  Evidence Code § 1108 violates due process on its face and as applied to petitioner's case."  4/28/08

28

1    Order to Show Cause at 2.  As shown below, the state court reasonably rejected petitioner's claims.

2                                        **STATEMENT OF THE CASE**

3                By information filed on March 28, 2005, and amended on February 21, 2006, the Alameda

4    County District Attorney charged petitioner with one count of kidnapping to commit rape and five

5    counts of rape, with allegations as to the rape counts that petitioner kidnapped the victim and that

6    the movement substantially increased the risk of harm to the victim over and above the level of risk

7    inherent in the commission of the offense, and that the rapes were committed against the same

8    victim on separate occasions, Cal. Penal Code §§ 209(b)(1), 261(a)(2), 667.61(d)(2), 667.6(c), (d).

9    Exh. A [hereafter "CT"] 178-186, 270-279.

10               On March 16, 2006, a jury found petitioner guilty as charged and found the special

11   allegations to be true.  CT 316-330; Exh. B [hereafter "RT"] 1560-1566.  On May 12, 2006, the trial

12   court sentenced petitioner to 25 years to life consecutive to a determinate term of 24 years.  CT 425-

13   431; RT 1580-1583.

14               On September 19, 2007, the California Court of Appeal affirmed petitioner's judgment,

15   Exh. H, and on November 29, 2007, the California Supreme Court denied review.  Exh. J.  Petitioner

16   filed a Petition for Writ of Certiorari on January 14, 2008, Exh. K, which was denied on March 17,

17   2008.  Exh. L.

18               Petitioner filed his federal petition for writ of habeas corpus on January 4, 2008.  The

19   petition is timely.  28 U.S.C. § 2244(d)(1); *Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999).

20                                        **STATEMENT OF FACTS**

21   **A.    Prosecution's Case**

22               Chanelle Doe was 20 years old at the time of trial.  She was five feet seven inches and

23   weighed about 110 pounds.  RT 451, 519.  On the morning of December 13, 2004, Chanelle

24   interviewed for a new job.  That evening, she went to a friend's house for dinner.  Her boyfriend and

25   her friend's boyfriend were also there.  RT 452-453, 544.

26               Chanelle left about 12:45 a.m. to take the bus to her cousin Tiffany's house on East 16th

27   Street in Oakland.  Sometime after she boarded the bus, a man, whom she identified as petitioner,

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

                                                    2

got on and sat next to her, although there were many empty seats.[1/]    Chanelle was a little uncomfortable, but she briefly talked with him because he started talking to her. RT 454-461. She first met petitioner in 1998, when she worked at a mall. Petitioner and his twin brother frequented the mall at the time, and Chanelle saw them at the bus stop periodically over the years. She said they were acquaintances, not friends. She had never dated petitioner, spoken on the phone with him, or socialized with him in any way. RT 462-464. That night, petitioner was wearing a black jacket, black shirt with white "Old English" writing on it, and blue jeans. RT 480.

When Chanelle got off the bus at Fruitvale and East 14th Street, petitioner got off with her. As Chanelle walked to the corner, petitioner stopped to talk with some people at the bus stop. RT 459-461. Chanelle started walking up Fruitvale to East 16th. As she walked, she noticed that petitioner was following her. Chanelle walked faster because she was nervous. When she got to the corner of Fruitvale and East 16th, petitioner was right behind her. RT 461-462, 464-465. Chanelle turned to petitioner and said, "I'm going home now," hoping that he would get the message and stop following her. RT 465.

As Chanelle turned to walk to her house, petitioner grabbed her from behind. Although petitioner put his arm around her neck, she was able to turn and push him away. She said, "What's going on?," and "You can't be robbing me. I don't have no pockets." RT 466. Petitioner grabbed her around the neck again, but tighter, making it hard to breathe. RT 467-468. With her neck in a headlock, petitioner dragged Chanelle about 50 feet down the street to a park.[2/] Once in the park, he grabbed her by the arm and forced her toward the rear of the park, where it was dark. RT 468-470. Petitioner forced Chanelle to the ground by a play structure and told her to take off her clothes.

---

1. The parties stipulated that Chanelle used her bus pass to board the bus at 1:02 a.m., and petitioner used his bus pass to board the same bus at 1:11 a.m. Petitioner also used his bus pass to board a bus on the same route at 5:13 a.m. that day. RT 1085.

2. A District Attorney investigator later measured the distance from the corner where petitioner accosted Chanelle to the entrance to the park as 222 feet. The distance from the corner to Chanelle's cousin's apartment was 400 feet. RT 989-990.

RT 471.[3/]  Chanelle took off her shoes, then said, "In order for me to take off my pants, I have to stand up."  RT 472.  When petitioner let her stand up, Chanelle tried to run.  She also screamed for help.  She felt as if something hit her in the back, which caused her to fall and twist her ankle.  RT 472-473.  Chanelle thought she might have blacked out for a moment because when she woke up she was on her back.  Petitioner was on top of her, pinning her shoulders with his knees and hitting her in the face and choking her.  She felt severe pain in her ankle.  RT 473-475.

While still pinning Chanelle to the ground, petitioner told her again to take off her clothes. She took off one pant leg, but could not take off  the other because her ankle hurt so much. Petitioner removed the other pant leg and her panties, then raped her.  After about 20 minutes, he ejaculated inside her.  RT 475-476.  Petitioner wanted Chanelle to move over to the play structure. Because she could not walk, he picked her up and held her as she hopped over and sat on the ground. Petitioner smoked a cigar and talked in a rambling manner for about 15 or 20 minutes while Chanelle sat in shock.  RT 477-479, 481.

Petitioner again told Chanelle to lay down on the ground.  He started to rape her a second time while she was on her back.  Because she said her leg was hurting, petitioner told her to turn onto her side and put her sore leg on the slide of the playground structure.  He put his penis in her from the back.  When she said her leg was still hurting, petitioner told her to turn onto her stomach, while he got on top of her and penetrated her.  When Chanelle complained again, petitioner turned her on her back and again raped her, this time ejaculating inside her.  RT 482-485.  When he was finished, petitioner told Chanelle to urinate.  She could not get up from the ground by herself, so petitioner helped her get up and hop over to a fence, where she urinated.  He then provided several tissues and told her to wipe herself and throw the tissues on the ground.  RT 485-487.

Petitioner helped Chanelle back to the playground area.  He smoked his cigar and talked

---

3.   The distance from the entrance to the park to the play structure was 330 feet.  The distance from the play structure to the rear of the park was 215 feet.  The width of the park along Fruitvale was 168 feet.  RT 991, 996-997.  There were trees and a row of multiple fences, which were six feet or higher and covered in ivy or barbed wire, between the park and the backyards of the adjacent apartment buildings and residences.  RT 993-994.

1   to her for about 10 minutes.  Chanelle decided to talk with him, hoping that he might feel

2   comfortable enough to let her go.  As they talked, Chanelle sat on the ground and petitioner paced

3   back and forth.  She did not try to get up and leave because her leg was swollen too badly and she

4   did not see any gap in the fence that she could get through.  RT 487-490.  After talking to her,

5   petitioner told Chanelle to lay down again.  RT 492-493.  She asked him, "How many times are you

6   going to do this to me?"  Petitioner replied, "Again and again and again."  RT 493.  Petitioner raped

7   Chanelle again.  Because Chanelle was shivering, he stopped, got up, and put his jacket over her,

8   after which he started raping her again.  After about 30 minutes, he ejaculated.  RT 493-495.  When

9   he was finished, petitioner resumed smoking his cigar and talking to Chanelle.  She continued to talk

10  to him, hoping he would let her go.  RT 496.  After about 30 minutes, petitioner told Chanelle to lay

11  down.  He raped her again, this time for 15 to 20 minutes.  RT 496-497.

12          After raping her, petitioner finished smoking his cigar and told Chanelle to get dressed.

13  He had to help her get one pant leg on because her leg was swollen.  Petitioner told Chanelle to get

14  up, but she asked him to leave her there because her leg hurt so badly.  She thought school would

15  be starting in a couple of hours and someone would find her.  RT 498-499.  Petitioner said he could

16  not leave her there.  He helped her up and over to a park bench, where she sat down.  RT 502-503.

17  Petitioner continued to tell Chanelle she had to get up and leave with him.  She said she could not,

18  because her leg hurt too much; she asked him to leave her there.  Petitioner said, "No, I can't leave

19  you here.  I'm not a bad person.  I'm not a bad person."  Chanelle could not believe he said that after

20  what he had done.  She said she "just looked at him."  RT 504.  Eventually, petitioner helped

21  Chanelle walk back to East 16th Street and Fruitvale.  RT 504-505.

22          On the street, petitioner asked Chanelle for a dollar.  She said she did not have any money,

23  but she had a bus pass.  Petitioner said he could not take her bus pass, but Chanelle said she would

24  get another one in a week.  She thought if petitioner took her bus pass, it would be useful as

25  evidence because it was unlikely he would have a bus pass that expired the same day as hers.  (She

26  later told the police her bus pass expired on December 18.  RT 506-508.)  Petitioner asked Chanelle

27  for her phone number.  When she refused, he said, "Oh, you are never going to speak to me again."

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

1    Chanelle thought, "This man has some serious issues."  RT 506.

2         After she persuaded petitioner to take her bus pass, Chanelle looked down the street

3    toward her cousin's house.  When she looked back, petitioner had disappeared from view.  She

4    hopped down the street, holding onto the fences along the sidewalk.  When she got to her cousin's

5    house, she shouted up to her cousin Brandon to come down and help her.  RT 508-510.  At the time,

6    Chanelle was cold and in shock.  Her ankle was hurting and she was wearing one shoe.  She had her

7    pants on inside out and mud on her side and front.  RT 510-511.  Brandon looked out of his window

8    and asked why she was shouting.  After she said she had been raped, a number of Chanelle's cousins

9    who lived in the same apartment building came to her assistance.  RT 511-513.

10        Soon after Chanelle arrived at the apartment, her cousins Tiffany and Brandon drove

11   around with her looking for petitioner.  When Chanelle said she needed to go to the hospital, they

12   returned to the apartment.  In the meantime, someone had called Chanelle's father and the police.

13   RT 513.  When she saw her father, Chanelle told him what had happened and described petitioner.

14   Her father left to look for petitioner shortly before the police arrived.  RT 514-515.  Before taking

15   her to the hospital, a police officer stopped by the park, and Chanelle pointed out the location of the

16   tissues she had used earlier, as well as petitioner's cigar butt.  Another officer arrived to take

17   photographs and collect evidence.  RT 515-516, 525-526.  Chanelle was taken to Highland Hospital

18   for an interview, examination, and treatment.  She had to use crutches for about nine months

19   afterward.  RT 526-531.  While Chanelle was still in the hospital, she identified petitioner, who had

20   been taken into custody.  RT 534-535.

21        In the early morning hours of December 14, 2004, Eric Washington received a call from

22   his nephew, Brandon, who told him that Chanelle, Washington's daughter, had been raped.

23   Chanelle was at Brandon's house at the time.  Washington immediately dressed and went to her.

24   Chanelle was very distraught and cried continuously.  Her hair was messy, her shirt was dirty, and

25   her pants were on inside out.  She had injuries around her neck and on her heel.  RT 381-384.

26   Chanelle said she got off the bus and started walking home.  A man got off the bus and followed her.

27   He grabbed her, took her to a park, and raped her.  RT 386-387.  Chanelle told her father the man

28

1    was "African-American; braids in his hair; he has a gap in his tooth [*sic*]; he's wearing a

2    black—black shirt, T-shirt with some letters white across the front." She also said he took her bus

3    pass. RT 387.

4           Washington and his niece's boyfriend, Terry, decided to drive around and see if they could

5    find anyone riding the bus that fit Chanelle's description. They saw one person on a bus and tried

6    to track his movements. After finding out the man had already exited the bus they were following,

7    Washington and Terry decided to return home. RT 387-392. On the way, they saw a man crossing

8    Broadway that looked like the man from the bus. The man looked directly at Washington, then

9    started running. RT 392-394. Terry ran after the man and caught up with him in the crosswalk, as

10   Washington blocked him with his car. Although Washington and Terry grabbed him and tried to

11   hold on to him, the man managed to drag them all to a bus stopped nearby, which he tried to board.

12   RT 394-397. While Washington and Terry held on to the struggling man at the front of the bus, the

13   bus driver called his supervisor. Officers arrived within a few minutes and took the suspect,

14   petitioner, into custody. RT 397-399, 427, 629-635, 647-648, 1052-1057.

15          When petitioner was apprehended, he was wearing a black shirt with white writing on it.

16   He had a cell phone and bus pass in his pocket. He did not appear to have any injuries, but he

17   seemed very nervous and agitated. RT 422, 633, 642, 650-651. Petitioner did not accuse

18   Washington and Terry of attacking him for no reason. Instead, he said he needed to leave. RT 633-

19   634, 639-640. He did not deny the accusation that he had committed a rape. RT 642-643.

20          Washington did not know petitioner and had never seen him in Chanelle's company. RT

21   425-427. Washington's daughter Erika also had never seen petitioner before, had never heard

22   Chanelle refer to him or to his twin brother, and had never known Chanelle to have any relationship

23   with either petitioner or his twin. RT 436-437, 448. Erika said that after the rape, Chanelle changed

24   from being outgoing, spontaneous, and friendly to being reclusive and afraid to go out alone.

25   Several months after the rape, she moved to Florida to attend a school for the arts. RT 433-435, 443,

26   451.

27          Officer John Biletnikoff responded to Chanelle's cousin's apartment at 4:45 a.m. on

28

1   December 14, 2004. Chanelle was visibly upset and crying. Her clothing was tattered and dirty and

2   she had only socks on her feet. She had visible bruising, scrapes, and swelling around her face and

3   neck. RT 596-598, 605-606, 617-618. After hearing Chanelle's report of a sexual assault, Officer

4   Biletnikoff drove her to the park to check for evidence, then drove her to Highland Hospital for a

5   sexual assault examination. RT 599-603, 612. After Officer Biletnikoff had taken her statement,

6   Chanelle identified petitioner, who had been brought to the hospital, as her attacker. RT 613-615.

7   Petitioner had no visible injuries when Officer Biletnikoff saw him at the hospital. RT 616.

8           Physician's assistant Joshua Luftig testified as an expert in sexual assault examinations.

9   RT 659-660. He conducted a sexual assault examination of Chanelle beginning about 7:30 a.m. on

10  December 14, 2004. She had two abrasions on her neck and swelling on her left ankle. X-rays later

11  showed that Chanelle's lower leg bone had been fractured, an injury that would have required

12  significant force. RT 666-678, 690-692. The fracture was unusual; it was not likely self-induced

13  from rolling the ankle. Chanelle reported that she had been stepped on. The injury could have taken

14  more than two months to heal. RT 907, 917-918.

15          Chanelle reported that she had been sexually assaulted between 1:30 and 4:30 a.m. on

16  December 14. She also had been jumped on, choked, hit, and threatened by her assailant. RT 684-

17  687. She had semen secretions on her thigh and tenderness on her posterior fourchette, an area

18  commonly injured in sexual assaults. RT 692-693, 697-699, 735-737, 918-919. Luftig summarized

19  his findings as follows: "Two abrasions to the left side of the neck; right anterior shoulder

20  tenderness; left ankle tenderness and swelling; right inner thigh, dried secretion; posterior fourchette

21  tenderness; moist secretion on cervix; moist secretion in vaginal pool." RT 707. Luftig opined that

22  his findings were consistent with the history provided. RT 707-708.

23          A sexual assault examination of petitioner conducted on December 14, 2004, showed that

24  he had minor abrasions on his left knee and right elbow and a hematoma in his hip area. He had no

25  other injuries and was not bleeding at the time of the examination. His clothing was collected, as

26  were swabs and blood samples for DNA testing. RT 758-759, 762-765, 767-769. When petitioner

27  was photographed in an interview room that day, he had no difficulty walking. RT 1079-1080.

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

8

1    Shannon Cavness examined the swabs from the sexual assault kits for Chanelle and

2    petitioner. She found a single male donor of semen on the swab from Chanelle's vagina. The DNA

3    profile of the single male donor was the same as petitioner's DNA profile. That DNA profile is

4    found in the population less than one in 156 quadrillion times, although identical twins have the

5    same DNA profile. The nonsperm fraction of the sample tested from Chanelle's kit was a mixture

6    of her DNA profile and petitioner's DNA profile. RT 783-786, 798, 828.

7    A paper towel collected at the crime scene showed high concentrations of acid

8    phosphatase, which was indicative of semen. A mixture of Chanelle's and petitioner's DNA profiles

9    was found in the sample tested. The sperm fraction was the same as petitioner's DNA profile. RT

10    788-790. A swab of petitioner's penis also showed a mixture of his and Chanelle's DNA profiles.

11    RT 792-793. When Cavness put petitioner's DNA profile into the Local DNA Index System, she

12    got a hit to a case involving Minako Doe. She did not get a hit to petitioner's twin brother, Terran

13    Smiley, which meant he was not in the system. RT 805-808.

14    Marcia Blackstock, executive director of Bay Area Women Against Rape, testified as an

15    expert in rape trauma syndrome. RT 950-951. Victims frequently experience shock, fear, denial,

16    guilt, shame, anger, and a sense of helplessness. Sometimes victims change their behavior after an

17    assault out of fear and a feeling of vulnerability. RT 951-955. Most sexual assaults are committed

18    by an individual known to the victim, and sometimes a rapist tries to befriend his victim after the

19    assault. In that case, a victim might try to connect with the rapist in the hope that it will help her get

20    away. RT 955-957. Often a victim will comply with her attacker's demands in order to survive.

21    RT 957-958. Based on some hypothetical questions reflective of the facts of this case, Blackstock

22    opined that the victim's behavior was not unusual for a sexual assault victim. RT 959-963.

23    **B.    Other Acts Evidence**

24    In June 2001, 23-year-old Minako Doe lived in Oakland at the corner of 34th Street and

25    Telegraph Avenue. She worked in San Francisco and attended San Francisco State University.

26    About 11:00 p.m. on June 15, 2001, Minako was on her way home from work. She stopped at a

27    liquor store as she walked from BART to her residence. At the store, she met a tall, Black man

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

1  named Hakim. Hakim introduced petitioner, who said his name was Derran, as his cousin. RT 268-

2  271, 284-285. Minako described petitioner as "short and muscular with braided hair and dark skin,

3  thick boned." RT 271. Both men followed Minako as she started to walk home. She spoke with

4  them for a few minutes at a bus stop. Petitioner suggested that they go to a park to drink the alcohol

5  they had purchased. Minako wanted to stay in the parking lot of the store, where it was well lit, but

6  petitioner wanted to get away from the street. After Hakim assured Minako that petitioner was okay,

7  they followed petitioner into the park. RT 272-274.

8        Minako, Hakim, and petitioner drank beer and talked for 20 or 30 minutes. RT 275-277.

9  Minako said she wanted to use the bathroom and started to walk back toward the liquor store.

10  Petitioner said he would accompany her. When Hakim said he would come with them, petitioner

11  said something to him, after which Hakim decided to stay in the park and listen to Minako's CD

12  player. RT 277. Minako and petitioner started to walk toward the store, but then petitioner wanted

13  to go in a different direction, into some bushes. When Minako resisted, he started to pull her toward

14  the bushes. Hakim came over to see what was going on. After petitioner talked to him, Hakim

15  returned to where he had been listening to music. RT 278.

16        Petitioner suggested that Minako urinate by the corner of a building in the park. Minako

17  followed his suggestion, but told him not to watch. When she saw that petitioner was watching her

18  against her wishes, she tried to walk away from him. Petitioner came after her and grabbed her, then

19  started punching her in the face. Minako said she would give him all of her money. She had about

20  $300 because she had just been paid. Petitioner asked her for more money and searched her purse.

21  When he did not find any more money, he started punching Minako again. RT 279-280, 288.

22  Petitioner got behind Minako and put his arm around her neck, choking her. He told her to take off

23  her pants. Minako complied because she could not breathe and thought she was going to die.

24  Petitioner then removed his own pants and raped her on the ground. RT 280-282, 289. When he

25  was finished, petitioner again repeatedly punched Minako in the head and face and demanded money

26  from her. Minako tried to tell him she had no more money. RT 289-291. At some point Hakim

27  appeared a short distance away. Petitioner asked him, "What do you want to do with this bitch?"

28

1   RT 291.  Hakim just looked at them, but said nothing.  Petitioner got up, kicked Minako in the jaw,

2   and ran off.  RT 291-292.

3           Hakim asked Minako what happened.  When she tried to run from him, unsure if he was

4   petitioner's accomplice, he said he wanted to protect her.  He walked with her to her apartment.  RT

5   292-293.  Once Minako got to her apartment and saw how badly she was injured, she went to

6   Summit Hospital.  After she told hospital personnel what had happened, they called the police, who

7   took her to Highland Hospital for a sexual assault examination.  RT 294-298.  When she was

8   interviewed by a police officer, Minako was upset, but able to provide information about her attack.

9   RT 325-330.

10          The DNA profile of the sperm fraction found in Minako's vaginal swab was entered into

11  CODIS (Combined DNA Index System).  RT 968-971.  On April 27, 2005, the profile was matched

12  to petitioner's DNA profile.  RT 971-972.  A new sample was obtained from petitioner to confirm

13  the match.  RT 973-975.

14          A beer bottle and a wine bottle had been recovered from the area of the park where

15  Minako said she had been drinking with petitioner and Hakim.  RT 333-334.  Four of petitioner's

16  fingerprints were found on the beer bottle.  RT 871-873, 879, 891.  One of Hakim Dadzie's

17  fingerprints was found on the beer bottle and two of his fingerprints were found on the wine bottle.

18  RT 880-881, 891-892.  Unlike DNA, fingerprints of identical twins are not the same.  RT 871-872,

19  979.  The fingerprints of petitioner and Terran Smiley were "totally different."  RT 885.

20          Joshua Luftig reviewed the report of a June 16, 2001, sexual assault examination of

21  Minako Doe.  Minako reported that she had been vaginally raped on the ground in a park.  She also

22  reported being hit in the face and head, being physically restrained, and being choked.  RT 711-718.

23  The physician assistant who conducted the examination concluded the physical findings were

24  consistent with the history of sexual assault.  RT 718.

25          Michela Doe was 15 years old at the time of trial.  In 1998, she was eight years old and

26  lived near the corner of 64th Street and Bancroft in Oakland with her aunt and grandmother.

27  Petitioner and his twin brother Terran lived in an upstairs apartment.  Michela could tell them apart

28

1  because Terran was taller than petitioner, and petitioner had more facial hair.  RT 1004-1006, 1032-

2  1033.

3          In May 1998, Michelea was invited to petitioner and Terran's apartment.  They told her

4  they were going to play some games, and petitioner directed her to a bathroom in the rear of the

5  apartment.  RT 1006-1007.  In the bathroom, petitioner told Michelea to get on her knees or he

6  would hurt her.  After removing his pants, he told her to put her mouth on his penis.  Michelea

7  complied because petitioner threatened to hurt her; he also threatened to hurt her and her family if

8  she told anyone what he was doing.  Petitioner directed Michelea to suck his penis until he

9  ejaculated, after which she spit into the toilet.  When petitioner let Michelea leave the bathroom, he

10  repeated his threat to her.  RT 1007-1009.

11          On a subsequent occasion in May 1998, petitioner pushed Michelea off her bike and took

12  her behind a tree in the park, where he sodomized her.  On another occasion, petitioner went into

13  Michelea's house, told her not to say anything, and directed her to pull down her pants and get on

14  the floor.  Petitioner pulled down his own pants and raped her.  RT 1010-1011, 1014.  Michelea said

15  petitioner forced her to suck his penis three times.  She was not sure how many times he raped or

16  sodomized her.  RT 1013-1015.

17          In the same time period, Terran took Michelea to a neighbor's house where he raped and

18  sodomized her.  He also forced her to suck his penis.  She was not sure how many times Terran

19  committed sexual acts against her.  RT 1012-1014.  On one occasion, Terran raped Michelea and

20  her friend Shardea at the same time.  RT 1024-1025.

21          At some point, after talking to Shardea's mother and to her grandmother, Michelea talked

22  to a woman in the police department about what had happened to her.  A videotape of her statement

23  was played to the jury.  RT 1015-1020, 1022-1023, 1025.  Michelea did not tell the policewoman

24  about all of the acts petitioner committed against her because petitioner had threatened her.  RT

25  1020-1022, 1036-1037, 1039-1041.  It was petitioner, not Terran, who sodomized her in the park,

26  contrary to what she said on the tape.  RT 1022, 1027, 1045.  Michelea did not think petitioner raped

27  and sodomized her when she was in the bathroom, although she said he had done so in her taped

28

1    statement. RT 1020-1022. Her statements on the videotape that petitioner repeatedly threatened to

2    kill her and her family were true. RT 1025-1026.

3         Detective Daniel Sellers interviewed petitioner on June 3, 1998. Petitioner, who was 15

4    years old, was not in custody at the time. RT 1089-1090, 1096-1197, 1121. The 20-minute tape of

5    his interview was played for the jury. RT 1092-1122.[4/] Petitioner admitted that on the afternoon of

6    May 23, 1998, he was in his apartment with his brother Terran and some neighborhood children,

7    including Michelea and Shardea. RT 1096-1101. He said Michelea was sitting next to him on the

8    couch in the living room. She began feeling his thighs and his "privates" over his clothes. RT 1101-

9    1103. Michelea left the room with Shardea. At one point, Michelea, Shardea, and Terran were all

10   in the bathroom together with the door open. RT 1104-1106.

11        Michelea came back to the couch, sat next to petitioner, and started rubbing his legs and

12   his privates again, causing him to become sexually aroused. RT 1106-1108. Petitioner noticed that

13   one of Michelea's buttons was undone on her shorts. She "hopped" on his lap and started rubbing

14   him and moving up and down. After awhile, Michelea stopped, lifted herself up, and pulled her

15   pants down to her knees. RT 1109-1111. She unbuttoned petitioner's pants, causing his erect penis

16   to "pop[] out." RT 1111-1112. Michelea pulled down her underwear and continued to move up and

17   down on petitioner's lap. She tried to put petitioner's penis in her vagina, but succeeded only in

18   having it rub the lips of her vagina. While Michelea continued to move up and down, petitioner

19   ejaculated. RT 1112-1116. At that point, Michelea heard her uncle coming up the stairs. She

20   jumped off petitioner, pulled up her pants, and moved to the other side of the couch. RT 1114-1116.

21   At Michelea's uncle's request, petitioner went to get his mother, who was elsewhere in the

22   apartment. When he returned to the living room, Michelea was gone. Petitioner thought Terran and

23   Shardea were still in the bathroom. RT 1116-1118.

24        Petitioner denied that he forced Michelea to do anything against her will, and said their

25   acts on the couch were consensual. He also denied threatening Michelea or using violence against

26

27        4. The tape was transcribed on the record. RT 1095-1122. A transcript is also contained
     in an augmentation to the Clerk's Transcript (People's Exh. No. 25a).

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

1   her.  He said they had never had sex before, although Michelea had rubbed his privates on three or

2   four previous occasions.  RT 1118-1121, 1130-1132.

3          Petitioner was not arrested immediately after the interview because the investigation was

4   ongoing.  He was arrested later that month for sex offenses involving Michelea.  Terran Smiley was

5   also arrested.  RT 1122-1125, 1128-1131.

6   **C.    Defense Case**

7          Petitioner was born on March 20, 1983.  When he was 11 or 12 years old, he was charged

8   with stealing a car.  He admitted the offense and spent three months in Juvenile Hall.  RT 1148,

9   1166, 1295-1297.  In 1997 he was two inches taller than his twin brother Terran.  In 1998, he had

10  sideburns and a mustache, but not a goatee, and had dyed his facial hair a gold color.  At the time

11  of trial, petitioner was three or four inches taller than Terran.  RT 1151, 1159-1161.  In 1998,

12  petitioner had known Michelea about three years.  During that time period, petitioner had a

13  girlfriend, Demetra Wallen, whose little sister was Shardea.  Petitioner impregnated Demetra when

14  he was 14 years old.  Their daughter was born on April 26, 1998.  RT 1152-1155.

15         Petitioner admitted that he made the statement to Detective Sellers in June 1998, but

16  denied that he committed any crime.  In particular, he denied that he sexually assaulted Michelea

17  in the park, that he did anything to her on the couch in his living room, that he forced her to orally

18  copulate him, or that he had anal sex with her.  He said he accepted blame for the offense involving

19  Michelea so that Terran, who also had been charged with sex offenses, would receive a lesser

20  sentence.  Both petitioner and Terran were committed to a group home as part of a plea agreement.

21  At some point, Terran told petitioner that he committed the sex offenses with Michelea and

22  Shardea.[5]  RT 1156-1164, 1254-1262.

23         After serving their term in the group home, petitioner and Terran moved back to their

24  mother's home for a few months.  They later moved out and began supporting themselves selling

25

26  _____

27        5.  On cross-examination, petitioner said that Terran only admitted to "finger-fucking"

28  Shardea.  Petitioner "put it together" that Terran also molested Michelea.  RT 1255-1256.

drugs. RT 1164-1165.[6] When petitioner was 18 years old, he lived with Latisha Newton and their son, who was born on November 23, 2000. They had a second son on February 11, 2004. RT 1166-1167. In 2000 and 2001, petitioner pimped girls for a few months. He was arrested and charged with pimping and pandering a 13-year-old girl. RT 1289-1295.

Petitioner said he first met Chanelle in 1998, when he was 14 years old. She was probably about 12 years old at the time. They exchanged phone numbers and talked to each other on the phone a few times. They also saw each other at the mall, where Chanelle worked at a shoe store. RT 1173-1175, 1306. When petitioner was in the group home, Chanelle wrote him letters. In 2001, they started seeing each other on a regular basis. Petitioner once saw Chanelle and her father at a park, where he sold them some marijuana. RT 1175-1179.[7] Petitioner described Chanelle as his "sex partner." RT 1180. He estimated that they had sexual intercourse 10 or 12 times between 1998 and December 2004. He recalled the last two times were in early September 2004 and on Thanksgiving that year. RT 1180-1191, 1300-1315.[8]

On December 13, 2004, petitioner was living with Terran in a motel on Broadway. That morning he took the bus to visit his sons. RT 1167-1170, 1241-1243. He left their home about 12:30 a.m. and got on the bus. When he boarded, he heard someone call his nickname, Twin, and saw Chanelle at the back of the bus. He sat down across from her. He said he expected to see Chanelle because she had called him earlier and told him to meet her on the bus. RT 1170-1172, 1191-1192. They started talking to each other, then got off the bus at Fruitvale. RT 1192-1194. At the bus stop, petitioner saw several friends. He and Chanelle talked and smoked marijuana with them for the next hour and a half. RT 1195, 1348.

After petitioner's friends left, he and Chanelle walked to a liquor store, but it was closed.

---

6. On cross-examination, petitioner said he sold drugs both before and after he went to the group home. He sold marijuana to kids in the neighborhood and at his school. RT 1287-1288.

7. Petitioner was still selling marijuana in December 2004. RT 1342.

8. Between September 2004 and Thanksgiving, petitioner was incarcerated on a domestic violence charge involving his sons' mother. Petitioner admitted he pleaded guilty to the charge, but he denied hitting the victim. RT 1310-1313, 1373-1374.

They walked to another store, where petitioner bought a drink for Chanelle and two cigars for himself.  As they walked back to Fruitvale, they smoked some marijuana.  RT 1195-1198.  At a bus stop in front of a park, Chanelle said she wanted to stop because she twisted her ankle.[9/]  They sat on a bench while petitioner smoked his cigar.  After awhile, Chanelle suggested that they walk around the park.  At the time, petitioner could see that she was limping slightly.  RT 1198-1199.  They walked to the back of the park, where they sat down on a bench near a play structure and talked for 15 or 20 minutes.  When petitioner finished his cigar, he asked Chanelle if she was ready to go.  She said she was cold, so petitioner gave her his jacket.  RT 1200-1202.  Chanelle put the jacket on a mat by the play structure and sat on it.  She started to pull off her pants, so petitioner pulled his pants down.  When Chanelle lay down, petitioner started having intercourse with her.  He said they engaged in intercourse for the next hour, until he ejaculated.  RT 1202-1204.  When they were finished, Chanelle said she had to urinate.  She limped to an area nearby, and petitioner handed her some tissue to use.  Afterward, they walked to another bench.  By that time, Chanelle needed assistance because she said her ankle had become swollen.  RT 1204-1206.

They sat on the bench and talked for a few minutes about where they were going to go.  Petitioner thought he was going to Chanelle's house, but she asked to go to his house.  When petitioner said his brother would not like it if she came to their room at that hour, she became upset.  RT 1206-1208.  Petitioner walked Chanelle part of the way to her house.  She said she could go the rest of the way on her own, and insisted that he take her bus pass.  Petitioner said he did not need her bus pass because he had one of his own, but he took it when she persisted.  RT 1208-1209.  Petitioner thought Chanelle was a "[l]ittle bit" angry.  She was "acting kind of funny.  Kind of high style."  RT 1209.  After he watched Chanelle walk down the street, petitioner returned to the bus stop on East 14th Street and took a bus to downtown Oakland.  RT 1209-1211.

---

9. Petitioner never saw Chanelle injure her ankle.  He said that while they were walking, she was "swinging" her leg, but he was unaware that it was bothering her.  RT 1353-1355.  She told him at the park that she had twisted her ankle earlier that day.  What turned out to be a fractured leg did not impact her standing at the bus stop for an hour and a half or walking up and down Fruitvale.  RT 1355-1357.

1    As petitioner was walking down Broadway, he saw a car approaching him very quickly.

2  The car stopped, and two men jumped out, one of whom was Eric Washington. RT 1211-1212.[10/]

3  Washington was angry. He had threatened petitioner on an earlier occasion because he did not want

4  petitioner around his daughter. RT 1212-1213. Petitioner ran toward a bus that was stopped nearby.

5  As he ran, Washington drove into him with his car. Petitioner rolled off the car, got up, and

6  continued running to the bus. After the bus driver opened his door, petitioner tried to get on, but the

7  men chasing him tried to stop him. Petitioner struggled with the men, who were hitting him and

8  holding him down, until the police arrived. RT 1213-1220. He was searched and handcuffed, then

9  taken to Highland Hospital. RT 1220-1223.

10    Chanelle had never accused petitioner of rape before December 14, 2004. RT 1316. He

11  thought she accused him of rape on that date because she was "mad" at him for refusing to take her

12  to his motel room after they had sex. He could not think of any other reason for her anger. RT

13  1317. However, they never spent the night together before. RT 1317-1318, 1378. Petitioner denied

14  that he hit Chanelle. He said, "I'm heavy handed. Hit her? She would have been tore up. Her face

15  would have been all messed up." RT 1373. He also denied choking, tripping, and forcing Chanelle

16  to the ground. He did not know how she got the abrasions and bruises on her neck. RT 1373-1376,

17  1385.

18    Petitioner said that Chanelle's father "lied" throughout his testimony, as did Chanelle's

19  sister Erika. RT 1326-1327. Chanelle also "lied" throughout her testimony. RT 1327. Petitioner

20  believed the bus driver was "coerced" because he did not testify that he saw Washington and Terry

21  hitting him. RT 1327-1328. He also thought Michelea was "coerced," and that the District

22  Attorney's office was "out there to get me." He never did anything to Michelea. RT 1331.

23  Petitioner admitted that he was a convicted criminal and that he had lied to the police on occasion,

24  but he was "telling the truth" about the incident involving Chanelle. RT 1328-1329.

25

26

27    10. Petitioner initially described the physical appearance of the two men, one of whom was
   very large, the other thin. When defense counsel asked, "Well, you said you had met Eric
   Washington before. Did you recognize him?" Petitioner replied, "Yes, I did." RT 1212.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| 1 | **STANDARD FOR GRANTING RELIEF** |
| 2 | The Court reviews the state court's rulings under a "highly deferential" standard imposed |
| 3 | by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Woodford v. Visciotti*, 537 |
| 4 | U.S. 19, 24 (2002) (per curiam). The federal court has no authority to grant habeas relief unless the |
| 5 | state court's ruling was "contrary to, or involved an unreasonable application of," clearly established |
| 6 | Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A decision constitutes an "unreasonable |
| 7 | application" of Supreme Court law if the state court's application of law to the facts is "objectively |
| 8 | unreasonable." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's ruling based on a |
| 9 | factual determination also must be "'objectively unreasonable' in light of the record" to warrant |
| 10 | habeas relief. *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003); 28 U.S.C. § 2254(d)(2). The |
| 11 | petitioner bears the burden of showing that the state court's decision was unreasonable. *Visciotti*, |
| 12 | 537 U.S. at 25. Even if a constitutional error occurred, habeas relief is available only if the error had |
| 13 | a "substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, ___ |
| 14 | U.S. ___, 127 S.Ct. 2321, 2325, 2328 (2007), internal quotation marks omitted; *see Brecht v.* |
| 15 | *Abrahamson*, 507 U.S. 619, 637 (1993). |
| 16 | **ARGUMENT** |
| 17 | **I.** |
| 18 | **THE STATE COURT REASONABLY REJECTED PETITIONER'S** |
| 19 | **CLAIM THAT INSUFFICIENT EVIDENCE SUPPORTED HIS KIDNAPPING CONVICTION AND THE KIDNAPPING SPECIAL ALLEGATIONS** |
| 20 | |
| 21 | Petitioner contends that insufficient evidence supported his kidnapping conviction and the |
| 22 | kidnapping special allegations. The state court reasonably rejected his claim. |
| 23 | **A.    State Court Of Appeal Decision** |
| 24 | The state court of appeal rejected petitioner's claim as follows: |
| 25 | Defendant contends there is insufficient evidence to support the aggravated |
| 26 | kidnapping conviction, because there is insufficient evidence to show that his movement of the victim was more than incidental to the commission of the five rapes. |
| 27 | The standard of review of the sufficiency of the evidence to support a conviction is well known. (See *People v. Mincey* (1992) 2 Cal.4th 408, 432.) The sole function of the |
| 28 | |

appellate court is to consider the evidence in the light most favorable to the judgment, presume in support of the judgment every fact that can be reasonably deduced from the evidence, and "determine … whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt." (*Ibid*.; see *People v. Jones* (1990) 51 Cal.3d 294, 314.) The evidence must be "reasonable, credible, and of solid value." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

"[W]hether the victim's forced movement was merely incidental to the rape is necessarily connected to whether it substantially increased the risk to the victim." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.) "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. [Citation.]" (*Ibid*.) The distance the defendant moved the victim is only one factor for the jury to consider. The jury must consider the distance "in context, including the nature of the crime and its environment." (*Ibid*.) The jury must view the movement in the context of whether it decreased the likelihood of detection, made it more difficult for the victim to escape, or made it more possible for the defendant to commit additional offenses. (*Ibid*.) Furthermore, there is no minimum number of feet a defendant must move the victim to be guilty of aggravated kidnapping. (*People v. Martinez* (1999) 20 Cal.4th 225, 233; *People v. Shadden* (2001) 93 Cal.App.4th 164, 168 [nine feet sufficient] (*Shadden*).)

Movement is more than merely incidental, and thus sufficient for aggravated kidnapping, if the movement increases the harm to the victim by relocating her from a public place to a private one. In *Shadden*, the defendant moved the victim from the front of a store to the rear room. (*Shadden, supra*, 93 Cal.App.4th at pp. 168-169.) In *People v. Diaz* (2000) 78 Cal.App.4th 243, 248-249, the defendant moved the victim from a public sidewalk into a darkened park.

Here defendant moved Chanelle 222 feet from where he initially accosted her to the entrance of the park, and then another 330 feet to the rear of the park. It was dark and there were trees and ivy-covered fences that blocked the view of the rape scene from adjacent houses. The movement was more than substantial and the movement of several hundred feet to the rear of a darkened park clearly decreased the chance of detection and diminished the chance of Chanelle escaping to the street. The above cases, especially *Diaz*, control and support our conclusion that the evidence is sufficient for aggravated kidnapping.

But defendant argues that all sex crimes "are committed in comparative seclusion," making the movement of the victim from a public place to a private one "incidental to the commission of the crime." He contends that "it is inherent" in a sex offense "that some movement to ensure a place and period of privacy is incidental to the commission of the crime." This argument finds no support in law or the logic of this case, and is inconsistent with the rules of law we have discussed above.

There is substantial evidence to support defendant's conviction for aggravated kidnapping.[11/]

Exh. H at 11-12, footnote in original.

---

11.    Defendant also challenges the sufficiency of the evidence to support the section 667.61(d)(2) enhancements. We reject this contention, and find the evidence sufficient, for the reasons set forth above.

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045 RMW (PR)

**B.    The State Court's Rejection Of Petitioner's Claim Was Reasonable**

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.*, quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338. On habeas review, a federal court evaluating the evidence should take into consideration all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to support a conviction, but mere suspicion and speculation cannot support logical inferences. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case. *Id.* at 1275. That is, the state court's application of the *Jackson* standard must be "'objectively unreasonable.'" *Id.* at 1275 n.13, quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000).

Here, the state court reasonably rejected petitioner's claim. Petitioner's statement that the victim was not in public view, the night was dark, and there was no evidence that any other people were around, Pet. at 8, only supports the court of appeal's ruling. As the state court observed, petitioner accosted the victim on the street late at night, dragged her several hundred feet to the rear of a darkened park, and raped her repeatedly. The victim's escape was blocked by trees and ivy-

1    covered fences, and she was unable to summon assistance from her isolated and remote location.

2    Under applicable state law, both the aggravated kidnapping conviction and the kidnapping

3    enhancements were amply supported by the evidence. Petitioner's movement of the victim a

4    substantial distance to a remote and darkened area substantially increased the risk of harm to the

5    victim over and above that inherent in the underlying offenses. Accordingly, petitioner's claim of

6    insufficient evidence is without merit and was reasonably rejected by the state courts.

7                                                    **II.**

8    **THE STATE COURT REASONABLY REJECTED PETITIONER'S**
     **CLAIM THAT UNCHARGED CONDUCT WAS ERRONEOUSLY**
9    **ADMITTED AGAINST HIM**

10          Petitioner contends that admission of evidence of uncharged conduct under California

11   Evidence Code section 1108 violated his rights to due process and a fair trial (claim two). He also

12   contends section 1108 violates due process on its face and as applied (claim six). The state court

13   reasonably rejected his claims.

14   **A.   State Court Record**

15          Before trial, the prosecution moved to admit evidence of petitioner's prior sexual conduct

16   with Michelea Doe in 1998, Minako Doe in 2001, and Chasiti Doe in 2003, under California

17   Evidence Code sections 1101(b) and 1108. CT 247-264. Petitioner opposed the prosecution's

18   motion. CT 266-267. The Court held a hearing on the motion, RT 180-191, and found all three

19   incidents admissible. After inquiring about the number of witnesses involved, the court stated it

20   would initially admit evidence of the 2001 and 2003 incidents, and reserve ruling on the 1998

21   incident under California Evidence Code section 352, depending on how much time was consumed

22   by the evidence. RT 185-192.

23          The evidence of the rape of Chasiti Doe was very similar to the rape of Minako Doe.

24   Although DNA evidence resulted in a cold hit identifying petitioner as the perpetrator, the

25   prosecutor acknowledged in his written motion that petitioner's twin brother had the same DNA.

26   CT 251 & fn. 2. Apparently, unlike in the case of Minako Doe, there was no other evidence

27   identifying petitioner as the perpetrator. *See* RT 183. The prosecutor ultimately presented evidence

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

of the Michela Doe and Minako Doe incidents (*see* Statement of Facts, *supra*), but no evidence relating to the Chasiti Doe incident. The record does not contain an on-the-record discussion of the prosecutor's decision to present the 1998 incident instead of the 2003 incident, but he referred only to the 1998 and 2001 incidents in his opening statement. RT 249-254.

**B.    State Court Of Appeal Decision**

The state court rejected petitioner's claim as follows:

Defendant contends the trial court deprived him of due process and a fair trial by admitting the evidence of prior sexual offenses involving Minako Doe and Michela Doe. He contends the evidence was inadmissible character evidence under Evidence Code section 1101 (section 1101) and was not properly admitted as propensity evidence under Evidence Code section 1108 (section 1108). We need not reach the section 1101 contention because the trial court properly admitted the evidence under section 1108.

Section 1108 allows the admission of evidence of prior sexual offenses to prove the defendant's criminal propensity to commit such crimes. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 910-912 (*Falsetta*).) Defendant contends section 1108 is unconstitutional because it violates due process of law. Our Supreme Court has considered and rejected this contention. (*Falsetta, supra*, at pp. 912-922.)[12]

Defendant also contends that section 1108 is unconstitutional because it violates equal protection. At least two courts have rejected this contention. (*People v. Waples* (2000) 79 Cal.App.4th 1389, 1394-1395; *People v. Fitch* (1997) 55 Cal.App.4th 172, 177-185.) We agree with these decisions and likewise reject the contention.

Finally, defendant contends the evidence was more prejudicial than probative and should not have been admitted under Evidence Code section 352 (section 352). We disagree and find no abuse of discretion by the trial judge.

**Minako Doe**. Defendant acknowledges the DNA "cold hit" linking him to Minako's rape. But he argues that because his twin brother Terran has an identical DNA profile, any DNA identification of defendant as the perpetrator would be "at best, a 50-50 proposition." Defendant thus concludes that the evidence against him is equally balanced, and the requisite preponderance of the evidence in support of the prior sexual offense is absent as a matter of law.

This argument is without merit. Defendant ignores the presence of his unique fingerprints on the beer bottle found at the rape scene. He also ignores Minako's in-court identification of him as the rapist. The requisite preponderance of the evidence is present.

Defendant also contends the evidence should not have been admitted because he was never convicted of raping Minako. But a conviction is not necessary for admission of evidence under section 1108, and the absence of a conviction is only one factor in the trial court's "careful weighing process" of assessing probity versus prejudice. (See *Falsetta,*

---

12.    Defendant acknowledges as much, but states he is raising the issue to preserve it "in the event of further post-conviction review. …"

1    *supra,* 21 Cal.4th at p. 917.)

2         There was no abuse of discretion in admitting the evidence involving Minako Doe.

3         **Michelea Doe**.  Defendant devotes only two paragraphs in his opening brief to his contention that the evidence involving Michelea Doe should not have been admitted.

4

5         Defendant contends that the incident was remote in time, occurred when he was "extremely young" (15), and was inflammatory in that it involved a young child.  But these are only some of the factors which go into the trial court's discretionary weighing process.  (See *Falsetta, supra*, 21 Cal.4th at p. 917.)  We see no abuse of discretion.

6

7         Defendant also argues that his juvenile court record should not have been used against him because after the 1998 group home placement he "was honorably discharged from control by the Youthful Offender Parole Board."  Such a discharge could free him of certain penalties and disabilities of his juvenile record under Welfare and Institutions Code section 1772.  (See, e.g., *People v. Jackson* (1986) 177 Cal.App.3d 708, 711-712 [statute precludes use of juvenile record for impeachment].)

8

9

10

11         The Attorney General, however, maintains in his respondent's brief that the record does not show that defendant received such a discharge.  Defendant does not dispute this point in his reply brief.  The probation report indicates that defendant's "overall juvenile probation performance [w]as poor."

12

13         Thus, this appears to be a nonissue.  In any event, any error would be harmless given the overwhelming evidence of defendant's guilt.

14

15    Exh. H at 12-14, footnote and boldface in original.

16    **C.    The State Court's Rejection Of Petitioner's Claim Was Reasonable**

17         Issues relating to the admission of evidence generally do not rise to the level of a federal

18    constitutional question.  *Estelle v. McGuire*, 502 U.S. 62, 68-72 (1991).  "Only if there are *no*

19    permissible inferences the jury may draw from the evidence can its admission violate due process.

20    Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'  [Citation.]"

21    *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991), original italics.  Where the evidence

22    is relevant to an issue in the case, the court need not further address the defendant's assumption that

23    admission of irrelevant evidence violates due process.  *Estelle v. McGuire*, 502 U.S. at 70.

24         California Evidence Code section 1108(a) provides, "In a criminal action in which the

25    defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual

26    offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible

27    pursuant to Section 352."  Rule 414(a) of the Federal Rules of Evidence provides, "In a criminal

28

1    case  in which the defendant is accused of an offense of child molestation, evidence of the

2    defendant's commission of another offense or offenses of child molestation is admissible, and may

3    be considered for its bearing on any matter to which it is relevant."  Rule 413(a) is identical except

4    that it applies to "sexual assault," rather than "child molestation."  The evidence is nevertheless

5    subject to Rule 403, which, like California Evidence Code section 352, restricts admission of

6    evidence that is more prejudicial than probative.  *United States v. LeMay*, 260 F.3d 1018, 1026 (9th

7    Cir. 2001).

8        The United States Supreme Court has not clearly established a rule that bars the

9    introduction of propensity evidence.  To the contrary, the Supreme Court expressly reserved the

10   issue in *Estelle v. McGuire*, 502 U.S. at 75 n.5.  In the absence of such authority, this Court cannot

11   conclude that the admission of uncharged sexual conduct violated due process. *Mejia v. Garcia*, ___

12   F.3d ___, 2008 U.S. App. LEXIS 15933, *22-26 (9th Cir. 2008); *Alberni v. McDaniel*, 458 F.3d 860,

13   863-867 (9th Cir. 2006); *Smith v. Pliler*, 278 F.Supp.2d 1060, 1075 (N.D. Cal. 2003); *Smith v. Roe*,

14   232 F.Supp.2d 1073, 1087 (C.D. Cal. 2002).

15       Moreover, in *United States v. LeMay,* the Ninth Circuit rejected the claim that Rule 414

16   violated due process by allowing propensity evidence in child molestation cases.  It noted that

17   "courts have historically allowed propensity evidence to reach the jury in sex offense cases."  260

18   F.3d at 1026.  The court did not rely solely on the historical evidence, however, but conducted its

19   own "independent inquiry into whether allowing propensity inferences violates fundamental ideas

20   of fairness." *Id*.

21       We conclude that there is nothing fundamentally unfair about the allowance of
     propensity evidence under Rule 414.  As long as the protections of Rule 403 remain in
22   place to ensure that potentially devastating evidence of little probative value will not reach
     the jury, the right to a fair trial remains adequately safeguarded.
23

24   *United States v. LeMay,* 260 F.3d at 1026.

25       The *LeMay* court further stated, "The evidence that [defendant] had sexually molested his

26   cousins in 1989 was indisputably relevant to the issue of whether he had done the same thing to his

27   nephews in 1997."  260 F.3d at 1026.  Evidence that a defendant has committed similar crimes in

28

the past is routinely admitted under Rule 404(b) to prove preparation, identity, intent, motive, absence of mistake or accident, and a variety of other purposes. "The introduction of such evidence can amount to a constitutional violation only if its prejudicial effect far outweighs its probative value." *United States v. LeMay*, 260 F.3d at 1026. The court found the defendant's reliance on *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993), unpersuasive.

> In *McKinney*, we granted a writ of habeas corpus and overturned a murder conviction where the petitioner's trial had been infused with highly inflammatory evidence of almost no relevance. *See McKinney*, 993 F.2d at 1384-85. LeMay, of course, emphasizes that *McKinney* held that the ban on propensity evidence is of constitutional magnitude. What he misses, however, is the fact that we held that such evidence will only *sometimes* violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have. Potentially devastating evidence of little or no relevance would have to be excluded under Rule 403. Indeed, this is exactly what Rule 403 was designed to do. We therefore conclude that as long as the protections of Rule 403 remain in place so that district judges retain the authority to exclude potentially devastating evidence, Rule 414 is constitutional.

*United States v. LeMay*, 260 F.3d at 1026-27. The "admission of even highly prejudicial evidence [does not] necessarily trespass on a defendant's constitutional rights." *Id.* at 1027. The question is whether the evidence is relevant and "not overly prejudicial." *Id.*; *see United States v. Norris*, 428 F.3d 907, 913-14 (9th Cir. 2005) (evidence may be admitted under Rule 414(a) if it is relevant, probative, and not outweighed by its prejudicial effect).

The federal rules of evidence operate in an identical fashion to California's rules of evidence with respect to the admission of prior acts of sexual misconduct. The federal courts have found that such rules of evidence do not violate a defendant's constitutional right to due process. Accordingly, the state court reasonably rejected petitioner's claim that admission of the uncharged misconduct here violated his right to due process, in light of its previous conclusion that the evidence was relevant and not unduly prejudicial.

As shown above, the state court found that ample evidence supported admission of the Minako Doe incident, including DNA, fingerprints, and Minako's eyewitness identification. The evidence was relevant to rebut petitioner's claim that Chanelle consented to the sexual acts. The court also rejected petitioner's claim that the Michelea Doe incident should not have been admitted because it was remote, he was very young, and the evidence was inflammatory. The latter incident

1    occurred about six and a half years before the current offenses, when petitioner was 15 years old.

2    Petitioner's own testimony showed that he impregnated one girlfriend when he was 14 years old;

3    he became a father again when he was 17 years old.  He had also engaged in pimping and pandering

4    and had been arrested for pandering a 13-year-old girl.  He later committed the Minako Doe assault.

5    The evidence thus showed a pattern of sexual conduct and sexual assault for a continuous period of

6    time from before the assault of Michelea Doe up to and including the assault of Chanelle.  His claim

7    the incident was remote and that he was "extremely young" is not supported by the record.  Further,

8    he had admitted sexually assaulting Michelea in 1998, resulting in a group home commitment.

9    Because petitioner fails to establish that the court of appeal's rejection of his claim was

10   unreasonable, it should be denied.

11          Moreover, even if error occurred, it was harmless.  *Fry v. Pliler*, 127 S.Ct. at 2325, 2328.

12   As the state court observed, the evidence against petitioner on the charged offenses was

13   overwhelming.  Chanelle, who knew petitioner, positively identified him as her attacker.  Her torn

14   and disheveled clothing, sexual assault examination findings, and fractured leg bore evidence to the

15   violent assault.  Her father and another man found petitioner, who was wearing the clothing Chanelle

16   described, shortly after the assault.  Petitioner did not deny the accusation that he had committed a

17   rape.  In addition, DNA and other physical evidence tied petitioner to the crimes.  In light of the

18   compelling evidence against him, petitioner did not deny he had sex with Chanelle.  Rather, he

19   claimed it was consensual.  However, Chanelle's battered condition and fractured leg showed

20   otherwise.  In light of the evidence against petitioner, any error in the admission of uncharged

21   conduct evidence could not have had a substantial and injurious effect or influence in determining

22   the jury's verdict.

23                                            **III.**

24   **THE STATE COURT REASONABLY REJECTED PETITIONER'S
     CLAIM THAT THE TRIAL COURT ERRED BY GIVING CALJIC NO.**

25   **2.62**

26          Petitioner contends the trial court's instruction with CALJIC No. 2.62 violated his Fifth

27   Amendment right against self-incrimination.  The state court reasonably rejected his claim.

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

## A.   State Court Record

After the prosecution rested, defense counsel stated for the record that petitioner was not required to testify, although he had the right to testify.  She wanted him to understand that if he testified, he could be impeached with his prior convictions for child molestation, vehicle theft, and pandering.  RT 1136.  The trial court reviewed the law for petitioner, including the applicable instruction relating to prior convictions.  RT 1137-1139.  Counsel then stated,

> You are also subject to cross-examination about the 2001 on Minako Doe.  There may be questions about that.  I can make objections, but I don't believe at this point that—Your Honor, he has not been charged with anything with Minako Doe, and I'm not sure that I would—I would be asking him any questions about that on direct for obvious reasons.
> So, I would ask that the District Attorney be advised not to go into the 2001 on Minako Doe.  We will leave that out.

RT 1140.  The prosecutor said the Minako Doe evidence was "being offered directly to show that he committed that act and he has a propensity."  The court asked if the prosecutor could still go into it if defense counsel did not.  The prosecutor responded, "Yes, because it goes to his propensity to commit these crimes.  If he's saying he has no propensity to commit these crimes—"  The court interjected, "Isn't that somewhat akin to exercising his right to remain silent?  That's something that you need to research.  That's an interesting point."  RT 1140.  The court deferred ruling pending further research.  RT 1141-1142.

During petitioner's testimony, the court and parties revisited the issue.  RT 1262-1271.  The prosecutor stated, "just given the defendant's direct examination testimony, I think certainly the issue of consent is well defined.  [¶]  I think the Minako Doe situation is directly relevant to this issue of consent."  The prosecutor also cited "several other things squarely at issue that Minako Doe relates to."  RT 1263.  The court and prosecutor discussed several cases that addressed the scope of cross-examination, including cross-examination on collateral matters that had not been charged.  RT 1264-1268.  The court also addressed the applicability of CALJIC No. 2.62 if petitioner refused to answer questions properly within the scope of cross-examination.  RT 1268-1269.  When defense counsel noted that petitioner might be charged in the Minako Doe case, the court stated, "my understanding is that once you take the stand and start testifying in your own behalf, you subject

1   yourself to any kind of cross-examination, no matter how much harm it can do to you, even as to

2   collateral matters." RT 1269.  The court stated that if petitioner refused to answer questions about

3   the Minako Doe incident, which it thought was relevant to petitioner's credibility, given the

4   similarity of the earlier offense and the charged crimes, instruction with CALJIC No. 2.62 would

5   be appropriate.  RT 1270.

6       The next morning, the parties again revisited the issue.  RT 1272-1280.  When defense

7   counsel again argued that charges might be brought against petitioner in the Minako Doe case, the

8   court responded it was "possible."  However, the court added, "My guess would be, just on my own

9   experience, that's probably not true.  It may be considered after this trial is over, but my guess is,

10  as of right now, today, it's probably sitting off to the side someplace waiting to see what happens

11  here." RT 1273.  Defense counsel stated that, notwithstanding the authorities the court and parties

12  had discovered, she would advise petitioner not to answer any questions about the incident.  RT

13  1273-1274.  Citing *People v. Thornton*, 11 Cal.3d 738, 760 (1974), RT 1274, the court stated, "It

14  seems to me that the issue of consent is now before this jury through the defendant's testimony, and

15  it would be completely proper to cross-examine on issues under 1108."  RT 1275.  Continuing to

16  cite *Thornton*, the court stated that a defendant who takes the stand waives his privilege against self-

17  incrimination, and that relevant cross-examination in this case would include questioning about the

18  Minako Doe incident.  RT 1276-1277.  The court told the prosecutor he could inquire into the

19  incident, but "not to be all morning with that kind of questioning," particularly if petitioner indicated

20  he had been advised by counsel not to answer questions.  RT 1277.

21      Near the conclusion of his cross-examination, the prosecutor asked a series of questions

22  concerning the Minako Doe incident. RT 1387-1391.  Petitioner refused to answer, stating, "From

23  the advice of my attorney, I would plead the Fifth."  RT 1387.  The court stated,

24          And, Mr. Smiley, you do so with the understanding that, in a hearing outside the
           presence of the jury, after reviewing the law on that subject, the court has indicated to you
25         that, once you begin to testify, anything relevant to your testimony becomes subject for
           cross-examination.
26

27  RT 1388.  Petitioner responded, "Yeah."  *Id*.  When the prosecutor continued with his questions,

28

1  petitioner said, "I still am not talking about something that I'm not being charged with." *Id*.

2  However, he responded to a question about his DNA, and said he did not know Minako Doe or

3  Hakim Dadzie. RT 1388-1390. When the prosecutor asked if his refusal to answer questions meant

4  he was refusing to accept responsibility for any crime he committed, petitioner replied, "No. If I

5  commit a crime, I always accept responsibility for it." RT 1391.

6      When the court and parties discussed jury instructions, defense counsel objected to

7  CALJIC No. 2.62. RT 1435. The court stated,

8      Okay. We discussed that at the time, and I think, as the court pointed out, it appears
       to this court that there is no real reasonable remedy when this happens.

9      Clearly, we talked about the different cases, and I relied—I think the case I primarily
       relied on was *People vs. Thornton*, although I don't remember specifically if that's it,

10     where the exact same scenario occurred there, and the court allowed it in that case. I
       didn't hear any authority to the contrary.

11

12  RT 1435. The court repeated that it thought the instruction was appropriate because petitioner put

13  his credibility in issue, and the Minako Doe incident was directly relevant to his credibility. RT

14  1435-1437. The court instructed the jury with CALJIC No. 2.62. CT 361; RT 1462.

15  **B.   State Court Of Appeal Decision**

16      The state court rejected petitioner's claim as follows:

17      Defendant contends that the trial court erred by giving CALJIC No. 2.62. We
        disagree.

18

19      Defendant took the stand and generally denied the charged offenses, i.e., the
        aggravated kidnapping and rape of Chanelle. He claimed his sexual intercourse with
        Chanelle was consensual. On cross-examination, the prosecutor asked him questions

20      regarding the uncharged incident involving Minako Doe. Defendant refused to answer
        the questions, invoking the Fifth Amendment. But defendant did testify that he did not

21      know Minako, that the DNA found in her vagina could be Terran's, and that he did not
        know Hakim.

22

23      Over defense objection, the trial court gave CALJIC No. 2.62, reasoning that
        defendant had put his credibility in issue and the Minako incident was directly relevant
        to defendant's credibility.

24

25      The court instructed the jury as follows:

26      "In this case defendant has testified to certain matters and has refused as to others.

27      "With regard to the alleged incident involving Minako Doe, if you find that the
        defendant failed to explain or deny any evidence against him introduced by the
        prosecution which he can reasonably be expected to deny or explain because of facts

28

within his knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable.

"The failure of a defendant to deny or explain evidence against him does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.

"If a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain this evidence."

Defendant contends this instruction should not have been given and violated his privilege against self-incrimination.  He is incorrect.  A defendant who takes the witness stand waives the privilege with regard to matters within the scope of relevant cross-examination.  (*People v. Thornton* (1974) 11 Cal.3d 738, 760 (*Thornton*), disapproved on unrelated grounds [in] *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.)  If the defendant makes a general denial of the charged offense or offenses, he thereby places in issue matters such as identity or credibility.  (*Thornton, supra,* 11 Cal.3d at p. 760; see *People v. Tealer* (1975) 48 Cal.App.3d 598, 604-605.)  Cross-examination regarding uncharged offenses is therefore proper.  (*Thornton, supra,* 11 Cal.3d at p. 760.)

We realize CALJIC No. 2.62 should be given sparingly.  But in light of defendant's general denial of the charged offenses, and his testimony that he did not know Minako or Hakim, the trial court properly gave CALJIC No. 2.62 and there is no constitutional error.  If there was error, it would be manifestly harmless.

Exh. H at 17-18.

## C.  The State Court's Rejection Of Petitioner's Claim Was Reasonable

A claim of state instructional error can be the basis of federal habeas relief only if the instruction "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. at 72.  "'It must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional] right.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  In reviewing an allegedly ambiguous instruction, the test  is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. at 72, citing *Boyde v. California*, 494 U.S. 370, 380 (1990).  The challenged instruction must be evaluated in light of the instructions as a whole, the evidence introduced at trial, and the arguments of counsel. *Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (per curiam); *Estelle v. McGuire*, 502 U.S. at 72.  When determining whether there is a reasonable likelihood the jury misapplied the instructions, the

1    court should not engage in speculation:

2        Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of
         meaning in the same way that lawyers might. Differences among them in interpretation
3        of instructions may be thrashed out in the deliberative process, with commonsense
         understanding of the instructions in the light of all that has taken place at the trial likely
4        to prevail over technical hairsplitting.

5    *Boyde v. California*, 494 U.S. at 380-381.

6        If the court finds there is a reasonable likelihood that the jury applied the challenged

7    instruction in a way that violated the Constitution, it must "determine then whether the instruction,

8    so understood, was unconstitutional as applied to the defendant. Even if the court found a

9    constitutional violation, however, it could not grant the writ without further inquiry. . . . The court

10   must find that the error, in the whole context of the particular case, had a substantial and injurious

11   effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S. at 147.

12       As the state court found, the prosecutor properly questioned petitioner on cross-

13   examination concerning his involvement in the Minako Doe incident. *See People v. Smith*, 30

14   Cal.4th 581, 614-615 (2003) (cross-examination of defendant regarding two rapes he committed

15   after the charged crimes was proper because the credibility of his partial confession was in issue);

16   *People v. Thornton*, 11 Cal.3d 738, 760-761 (1974) (cross-examination of defendant regarding two

17   uncharged incidents was proper because identity was squarely in issue). As the state court also

18   found, instruction with CALJIC No. 2.62 was proper after petitioner answered some questions

19   regarding the Minako Doe incident, but declined to answer others. *People v. Thornton*, 11 Cal.3d

20   at 760-761 (defendant who takes the stand to testify waives Fifth Amendment privilege against self-

21   incrimination to the extent of the scope of relevant cross-examination; instruction permitting the jury

22   to draw adverse inferences from defendant's refusal to answer was proper).

23       As the record shows, petitioner was well aware before he testified that he might be

24   questioned regarding the Minako Doe incident. He nevertheless chose to testify, but only selectively

25   answered questions concerning the uncharged incident. Accordingly, the trial court was justified

26   in giving CALJIC No. 2.62, which permitted the jury to draw an unfavorable inference from

27   petitioner's refusal to answer questions that were within his knowledge. The instruction also stated,

28

however, that the prosecution still bore the burden of proof beyond a reasonable doubt as to every essential element of the charged offenses. The instruction also stated that it would be unreasonable to draw an adverse inference if petitioner did not have the knowledge he would need to explain or deny evidence against him. Petitioner had testified that he did not know Minako or Hakim, and that the DNA found on Minako could have belonged to his twin brother. Thus, the jury could have inferred, if it believed him, that he did not have the requisite knowledge to answer further questions. On this record, petitioner cannot show the state court unreasonably rejected his claim. The challenged instruction did not violate petitioner's privilege against self-incrimination in light of his decision to testify and his knowledge of the risks if he refused to answer certain relevant questions.

Even if petitioner could have shown that CALJIC No. 2.62 should not have been given, he could not show the error had a substantial and injurious effect or influence in determining the jury's verdict. *Fry v. Pliler*, 127 S.Ct. at 2325, 2328. Even without the instruction, the jury could have drawn an adverse inference from petitioner's refusal to answer certain questions concerning Minako Doe. (Indeed, the instruction substantially lessens the danger the jury would draw too great an adverse inference by repeating that the prosecution still bore the burden of proof on every element of the charged offenses.) And even had the Minako Doe incident not been raised in cross-examination at all, the outcome would not have been different. Petitioner admitted he had been arrested for pimping and pandering, including pandering a 13-year-old girl. He admitted that he took responsibility for the crimes involving Michelea Doe, although he said he did so to protect his brother, who he claimed was really the guilty party. Most significantly, he admitted that he had sex with Chanelle, which he claimed was consensual. Yet Chanelle's physical condition after the rapes, including her disheveled clothing, injuries to her genitals, and fractured leg, her immediate report of having been raped and her hysterical demeanor, which were testified to by family members and police officers, and her testimony at trial, all supported the prosecution's contention that Chanelle had been raped and that the intercourse was not consensual. Since nothing supported petitioner's claim of consent other than his own testimony, and since his own testimony showed he had been involved in criminal conduct since the age of 11 and hence that he lacked credibility, the trial court's

1    instruction with CALJIC No. 2.62, which was responsive to properly admitted evidence, could not

2    have been prejudicial.  As the state court found, the overwhelming evidence rendered any error

3    harmless.

4                                              **IV.**

5    **THE STATE COURT REASONABLY REJECTED PETITIONER'S
     CLAIM THAT THE TRIAL COURT ERRED BY GIVING CALJIC NO.**

6    **2.50.01**

7          Petitioner contends the trial court erred by giving CALJIC No. 2.50.01, which addressed

8    the evidence of uncharged conduct.  The state court reasonably rejected his claim.

9    **A.    State Court Of Appeal Decision**

10         The state court rejected petitioner's claim as follows:

11         The trial court instructed the jury with the 2002 revision of CALJIC No. 2.50.01,
     which reads in pertinent part:

12

13         "If you find that the defendant committed a prior sexual offense, you may, but are
     not required to, infer that the defendant had a disposition to commit sexual offenses.  If
     you find that the defendant had this disposition, you may, but are not required to, infer that

14   he was likely to commit and did commit the sexual offense or offenses of which he is
     accused.

15

16         "However, if you find by a preponderance of the evidence that the defendant
     committed a prior sexual offense or offenses, that is not sufficient by itself to prove
     beyond a reasonable doubt that he committed the charged crimes.  If you determine an

17   inference properly can be drawn from this evidence, this inference is simply one item for
     you to consider, along with all other evidence, in determining whether the defendant has

18   been proved guilty beyond a reasonable doubt of the charged crimes."

19         Defendant contends that CALJIC No. 2.50.01 allowed the jury to (1) find by a
     preponderance of the evidence that he committed the prior sexual offenses; (2) infer from

20   his commission of the prior offenses that he had a disposition to commit sexual offenses;
     and (3) infer from that disposition that he "did commit" the charged offenses without

21   determining beyond a reasonable doubt that [he] did commit the charged offenses.[13]

22         Our Supreme Court considered and rejected a similar argument in *People v. Reliford*
     (2003) 29 Cal.4th 1007, 1012-1014, 1016 (*Reliford*).  The court found no confusion

23   regarding burden of proof or other constitutional error with the 1999 version of CALJIC
     No. 2.50.01, which was similar to the 2002 version, but had less cautionary language

24   about the burden of proof.  The court noted that the 2002 version was "an improvement."

25   ────────────────────────────────────────────

26        13.  To be precise, we should note that defendant argues the alleged error arose from a
     combination of three instructions:  CALJIC No. 2.50.01, CALJIC No. 2.50.1 [requiring proof of

27   prior sexual offenses by preponderance of the evidence], and CALJIC No. 2.50.2 [defining
     preponderance of the evidence].  But his real complaint is with CALJIC No. 2.50.01.

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

1  (*Reliford, supra,* at p. 1016.)

2      Defendant admits he raises this issue solely for federal postconviction review.  In
3  light of *Reliford*, we reject this contention.

4  Exh. H at 14-15, footnote in original.

5  **B.    The State Court's Rejection Of Petitioner's Claim Was Reasonable**

6      As noted above, a claim of state instructional error can be the basis of federal habeas relief

7  only if the instruction, considered in light of all the instructions given and the trial record, "so

8  infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire,* 502

9  U.S. at 72.  The challenged instruction must be evaluated in light of the instructions as a whole, the

10  evidence introduced at trial, and the arguments of counsel.  *Id.*; *Middleton v. McNeil*, 541 U.S. at

11  438.  "Even if the court found a constitutional violation, however, it could not grant the writ without

12  further inquiry. ...  The court must find that the error, in the whole context of the particular case, had

13  a substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S.

14  at 147.

15      Contrary to petitioner's claim, the challenged instruction did not permit the jury to use

16  evidence of uncharged conduct as direct evidence of the charged crimes.  "Rule 414 does not create

17  a presumption that a defendant is guilty because he has committed similar acts in the past; it merely

18  allows the jury to consider prior similar acts along with all other relevant evidence." *United States*

19  *v. LeMay*, 260 F.3d at 1031.  Similarly, California Evidence Code section 1108, as explained in

20  CALJIC No. 2.50.01, permits the jury to consider inferences arising from evidence of uncharged acts

21  in determining whether the defendant is guilty of the charged crimes, but it does not constitute direct

22  evidence of the charged crimes, nor may the jury rely on the uncharged conduct alone in finding the

23  defendant guilty.  Rather, as the jury was instructed, it had to find each element of each crime proven

24  beyond a reasonable doubt.  That the uncharged conduct need only be shown by a preponderance

25  of the evidence does not violate due process. *See United States v. Norris*, 428 F.3d at 914 (proof

26  of prior sexual act is by preponderance of the evidence).

27      The state court here reasonably rejected petitioner's claim that the instruction violated due

28

1    process. *People v. Reliford*, 29 Cal. 4th 1007, 1012-16 (2003) (upholding 1999 revision of CALJIC

2    NO. 2.50.01); *Smith v. Roe*, 232 F. Supp. 2d at 1089-91 (same).  Nor is a different result required

3    by *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004), where the Ninth Circuit found that the 1996

4    version of the instruction erroneously permitted the jury to convict based on a preponderance of

5    evidence standard.  The *Gibson* court suggested that the 1999 revision would pass constitutional

6    muster, noting that the California Supreme Court had approved that language in *People v. Falsetta*,

7    21 Cal.4th 903, 923-24 (1999).  *See Gibson v. Ortiz*, at 818-19.  Further, unlike the instruction given

8    in *Gibson*, the 1999 version (as well as the 2002 version) of CALJIC No. 2.50.01 expressly told the

9    jury, "if you find by a preponderance of the evidence that the defendant committed a prior sexual

10   offense, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the

11   charged crimes."  The jury was instructed more than once that the prosecution bore the burden of

12   proving every essential element of the charged crimes beyond a reasonable doubt.  CALJIC No.

13   2.50.01 repeated that requirement.  Also unlike *Gibson*, the prosecutor in this case did not rely on

14   an improper inference; he told the jury it had to find proof of the charged crimes beyond a

15   reasonable doubt.  RT 1481, 1545; *see Middleton v. McNeil*, 541 U.S. at 438.  Since the trial court

16   gave the even more improved 2002 version of CALJIC No. 2.50.01, *see* RT 1455-1457, petitioner's

17   claim fails.  *Hiskas v. Pliler*, 2007 U.S. App. LEXIS 30026, *3 (9th Cir. 2007); *Hassinger v. Adams*,

18   2007 U.S. App. LEXIS 17869, *2 (9th Cir. 2007); *McGee v. Knowles*, 2007 U.S. App. LEXIS 1261,

19   *2 (9th Cir. 2007).[14/]

20       Even if petitioner could have prevailed on his claim that the instruction was erroneous,

21   he could not show a substantial and injurious effect or influence on the jury's verdict.  *Fry v. Pliler*,

22   127 S.Ct. at 2325, 2328.  While the challenged evidence and instructions were certainly relevant to

23   the issues to be decided, they were not essential to a determination of guilt.  As the state court

24   pointed out on more than one occasion, the evidence of the charged offenses was overwhelming.

25   Accordingly, petitioner is not entitled to relief on his claim.

26   _____

27       14.  Citation to unpublished circuit decisions filed after January 1, 2007, is permitted by
     Fed.R.App.P. 32.1(a) and Circuit Rule 36-3(b).

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

1

**V.**

2

**THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT HE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL**

3

4    Petitioner contends he was denied the effective assistance of counsel because counsel did

5 not object to evidence of rape trauma syndrome.  The state court reasonably rejected his claim.

6 **A.    State Court Of Appeal Decision**

7    The state court rejected petitioner's claim as follows:

8    Defendant contends his trial counsel was constitutionally ineffective for three reasons: (1) failing to object to physician assistant Luftig's expert opinion that the results of his sexual assault examination of Chanelle were consistent with Chanelle's report of sexual assault; (2) failing to object to evidence regarding rape trauma syndrome; and (3) failing to object to Luftig's testifying about the content of the sexual examination report, prepared by another physician assistant, regarding Minako Doe.

9

10

11

12    To establish a claim of ineffective counsel, a defendant must show (1) that counsel's performance was deficient; and (2) that the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*).)

13

14    To establish deficient performance, a defendant must show that counsel's performance fell below an objective standard of reasonable competence. (*Strickland, supra,* 466 U.S. at pp. 687-688; *Anderson, supra,* 25 Cal.4th at p. 569.) When a claim of deficient performance is made on direct appeal, and where the record on appeal does not show the reason for counsel's challenged failures of performance, we must affirm unless "there could be no satisfactory explanation." (*Anderson, supra,* 25 Cal.4th at p. 569; *People v. Pope* (1979) 23 Cal.3d 412, 426 (*Pope*).)

15

16

17

18    In cases where there might be such a satisfactory explanation (such as trial tactics) which is not revealed by the record, a defendant must raise the claim of ineffective counsel by a habeas corpus proceeding and seek an evidentiary hearing to explore additional facts. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267; *Pope, supra,* 23 Cal.3d at p. 426.)

19

20

21    This case is somewhat unusual, as defendant did file a habeas corpus petition. (*In re Derran Smiley*, A116804.) We denied that petition on February 21, 2007, for failing to state facts sufficient to establish a prima facie claim for relief. But that petition was supported by a declaration of trial counsel, in which she states under penalty of perjury that she did have sound tactical reasons for the three failures to object.

22

23

24    We hereby take judicial notice of our records in the habeas corpus proceeding, including trial counsel's declaration. We reject defendant's claims of ineffective counsel because the declaration shows sound tactical reasons for counsel's failure to object—not

25

26

27

28

1    ineffective performance.[15/]

2        Even assuming defendant had made a showing on direct appeal of deficient
3    performance of counsel, we would nevertheless affirm the conviction unless the deficient
     performance has been prejudicial—i.e., that but for counsel's deficient performance it is
4    reasonably probable that the result of the trial would have been different. (*Strickland,*
     *supra,* 466 U.S. at p. 694; *Anderson, supra,* 25 Cal.4th at p. 569.)  "A reasonable
5    probability is a probability [that is] sufficient to undermine confidence in the outcome."
     (*Strickland, supra,* at p. 694.)

6        The defendant must show prejudice by affirmative proof.  (*Strickland, supra,* 466
7    U.S. at p. 693.)  If defendant fails to meet his burden of showing prejudice, a reviewing
     court should reject his claim of ineffective counsel without even reaching the question
8    whether counsel's performance was deficient.  (*Id.* at p. 697; *In re Alvernaz* (1992) 2
     Cal.4th 924, 945.)

9        In the present case, on the record before us, we would find a lack of prejudice due
     to the overwhelming evidence of defendant's guilt.

10

11   Exh. H at 15-17, footnote in original.

12   **B.    The State Court's Rejection Of Petitioner's Claim Was Reasonable**

13       As the state court explained, in order to establish that counsel was ineffective, petitioner

14   bears the burden of showing that counsel's performance fell below an objective standard of

15   reasonableness under prevailing professional norms, and that there is a reasonable probability the

16   result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687-

17   688, 695-696 (1984).  For petitioner to succeed on federal habeas review, "he must do more than

18   show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first

19   instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its

20   independent judgment, the state-court decision applied *Strickland* incorrectly."  *Bell v. Cone*, 535

21   U.S. 685, 698-699 (2002) (per curiam).  Rather, petitioner  must show that the state court applied

22   *Strickland* to the facts of his case in an objectively unreasonable manner.  *Id.*  Thus, federal habeas

23

24       15. The Attorney General relies on the trial counsel's declaration in his respondent's brief.
     In his reply brief, defendant responds to that reliance by simply stating that "even tactical decisions
25   of counsel may demonstrate incompetence."  In support of this statement defendant cites *People v.*
26   *Frierson*, 25 Cal.3d 142, 163 (1979).  His reliance on *Frierson* is misplaced.  That case only states
     that tactical decisions may show incompetence if made without a substantial investigation into the
27   facts of the case.  Defendant makes no allegation that his trial counsel's factual inquiry was
     insufficient.

28

1  review of a claim of ineffective assistance is "doubly deferential." *Yarborough v. Gentry*, 540 U.S.

2  1, 6 (2003) (per curiam).

3      The state court reasonably rejected petitioner's claim.  Petitioner claims that evidence of

4  rape trauma syndrome was used as substantive evidence of his guilt.  He is mistaken.

5      "[E]xpert testimony that a complaining witness suffers from rape trauma syndrome is not

6  admissible to prove that the witness was raped."  *People v. Bledsoe*, 36 Cal.3d 236, 251 (1984).

7  However, "expert testimony on rape trauma syndrome may play a particularly useful role by

8  disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may

9  evaluate the evidence free of the constraints of popular myths."  *Id*. at 247-248.

10      Trial counsel explained why she did not object to the expert's testimony on rape trauma

11  syndrome:

12          I did not object to the use of the rape trauma syndrome evidence as objecting would
           have only drawn more attention to the testimony.  The Rape Trauma expert, is widely
13         known to be pro-prosecution.  It was a strategic decision to minimize the testimony of an
           expert who had not examined either of the rape victims and who was offering only
14         generalized testimony about rape.  My strategy was to minimize any deleterious effect.
           It was not beyond the scope of the expert's testimony to render an opinion on a
15         hypothetical with facts that were close to the case.

16  Exh. A, ¶ 3 to Exh. G (Petition for Writ of Habeas Corpus).  Counsel's assessment was correct, and

17  consequently petitioner fails to establish ineffective assistance of counsel.

18      "Generally, an expert may render opinion testimony on the basis of facts given 'in a

19  hypothetical question that asks the expert to assume their truth.'  [Citation.]  Such a hypothetical

20  question must be rooted in facts shown by the evidence, however."  *People v. Gardeley*, 14 Cal.4th

21  605, 618 (1996); *see People v. Gonzalez*, 38 Cal.4th 932, 946-947 (2006).

22      Here, Blackstock answered hypothetical questions rooted in facts shown by the evidence,

23  but she did not opine on whether Chanelle had been raped.  She also testified that she had not met

24  with the victim and had not read the police reports.  She was testifying only about "rape trauma

25  syndrome," which she believed to be "a very universal reaction."  She did not want to be influenced

26  by "an actual individual or actual testimony or report."  RT 963.

27      Counsel was not ineffective for failing to object to testimony that was properly admitted

28

1  under state law.  As the state court of appeal also noted, there was overwhelming evidence of the

2  charged offenses.  The rape trauma expert's brief testimony could not have been prejudicial.  Since

3  the state court reasonably rejected petitioner's ineffective assistance of counsel claim, it should be

4  denied.

**CONCLUSION**

6      For the reasons stated, respondent respectfully requests that the petition for writ of habeas

7  corpus be denied.

8      Dated:  August 7, 2008

9                          Respectfully submitted,

10                         EDMUND G. BROWN JR.
                           Attorney General of the State of California

11                         DANE R. GILLETTE
                           Chief Assistant Attorney General

12                         GERALD A. ENGLER
13                         Senior Assistant Attorney General

                           PEGGY S. RUFFRA
14                         Supervising Deputy Attorney General

15

16                         /s/ Joan Killeen
                           JOAN KILLEEN
17                         Deputy Attorney General

                           Attorneys for Respondent
18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

1

**TABLE OF CONTENTS**

2
**Page**

3  STATEMENT OF THE CASE                                                                    2

4  STATEMENT OF FACTS                                                                       2

5  STANDARD FOR GRANTING RELIEF                                                            18

6  ARGUMENT                                                                                18

7  I.    THE STATE COURT REASONABLY REJECTED
       PETITIONER'S CLAIM THAT INSUFFICIENT EVIDENCE
8      SUPPORTED HIS KIDNAPPING CONVICTION AND THE
       KIDNAPPING SPECIAL ALLEGATIONS                                                       18

9
      A.  State Court Of Appeal Decision                                                    18
10
      B.  The State Court's Rejection Of Petitioner's Claim Was Reasonable                  20
11

12 II.   THE STATE COURT REASONABLY REJECTED
       PETITIONER'S CLAIM THAT UNCHARGED CONDUCT WAS
13     ERRONEOUSLY ADMITTED AGAINST HIM                                                     21

14     A.  State Court Record                                                               21

15     B.  State Court Of Appeal Decision                                                   22

16     C.  The State Court's Rejection Of Petitioner's Claim Was Reasonable                 23

17 III.  THE STATE COURT REASONABLY REJECTED
       PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED
18     BY GIVING CALJIC NO. 2.62                                                            26

19     A.  State Court Record                                                               27

20     B.  State Court Of Appeal Decision                                                   29

21     C.  The State Court's Rejection Of Petitioner's Claim Was Reasonable                 30

22 IV.   THE STATE COURT REASONABLY REJECTED
       PETITIONER'S CLAIM THAT THE TRIAL COURT ERRED
       BY GIVING CALJIC NO. 2.50.01                                                         33

23
      A.  State Court Of Appeal Decision                                                    33
24
      B.  The State Court's Rejection Of Petitioner's Claim Was Reasonable                  34
25
26

27

28

**TABLE OF CONTENTS  (continued)**

1
                                                                                    **Page**
2

3       **V.      THE      STATE      COURT      REASONABLY      REJECTED
                   PETITIONER'S CLAIM THAT HE WAS DENIED THE**
4                  **EFFECTIVE ASSISTANCE OF COUNSEL**                              36

5           A.    State Court Of Appeal Decision                                    36

6           B.    The State Court's Rejection Of Petitioner's Claim Was Reasonable  37

7    CONCLUSION                                                                     39

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045
RMW (PR)

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4   *Alberni v. McDaniel*
    458 F.3d 860 (9th Cir. 2006)                                    24

5
    *Bell v. Cone*
6   535 U.S. 685 (2002)                                             37

7   *Bowen v. Roe*
    188 F.3d 1157 (9th Cir. 1999)                                    2

8
    *Boyde v. California*
9   494 U.S. 370 (1990)                                         30, 31

10  *Brecht v. Abrahamson*
    507 U.S. 619 (1993)                                            18

11
    *Donnelly v. DeChristoforo*
12  416 U.S. 637 (1974)                                            30

13  *Estelle v. McGuire*
    502 U.S. 62 (1991)                                  23, 24, 30, 34

14
    *Fry v. Pliler*
15  ___ U.S. ___
    127 S.Ct. 2321 (2007)                               18, 26, 32, 35

16
    *Gibson v. Ortiz*
17  387 F.3d 812 (9th Cir. 2004)                                   35

18  *Hassinger v. Adams*
    2007 U.S. App. LEXIS 17869, *2 (9th Cir. 2007)                 35

19
    *Hiskas v. Pliler*
20  2007 U.S. App. LEXIS 30026, *3 (9th Cir. 2007)                 35

21  *Jackson v. Virginia*
    443 U.S. 307 (1979)                                            20

22
    *Jammal v. Van de Kamp*
23  926 F.2d 918 (9th Cir. 1991)                                   23

24  *Juan H. v. Allen*
    408 F.3d 1262 (9th Cir. 2005)                                  20

25
    *LaMere v. Slaughter*
26  458 F.3d 878 (9th Cir. 2006)                                   20

27  *McGee v. Knowles*
    2007 U.S. App. LEXIS 1261, *2 (9th Cir. 2007)                  35

28

**TABLE OF AUTHORITIES  (continued)**

Page

*McKinney v. Rees*
993 F.2d 1378 (9th Cir. 1993)                                          25

*Mejia v. Garcia*
___ F.3d ___
2008 U.S. App. LEXIS 15933 *22-26 (9th Cir. 2008)                     24

*Middleton v. McNeil*
541 U.S. 433 (2004)                                               30, 34, 35

*Miller-El v. Cockrell*
537 U.S. 322 (2003)                                                   18

*Payne v. Borg*
982 F2d 335 (9th Cir. 1992)                                           20

*People v. Bledsoe*
36 Cal.3d 236 (1984)                                                  38

*People v. Falsetta*
21 Cal.4th 903 (1999)                                                 35

*People v. Frierson*
25 Cal.3d 142 (1979)                                                  37

*People v. Gardeley*
14 Cal.4th 605 (1996)                                                 38

*People v. Gonzalez*
38 Cal.4th 932 (2006)                                                 38

*People v. Reliford*
29 Cal. 4th 1007 (2003)                                               34

*People v. Smith*
30 Cal.4th 581 (2003)                                                 31

*People v. Thornton*
11 Cal.3d 738 (1974)                                               28, 31

*Smith v. Pliler*
278 F.Supp.2d 1060 (N.D. Cal. 2003)                                   24

*Smith v. Roe*
232 F.Supp.2d 1073 (C.D. Cal. 2002)                                24, 35

*Strickland v. Washington*
466 U.S. 668 (1984)                                                   37

*United States v. LeMay*
260 F.3d 1018 (9th Cir. 2001)                                      24, 25, 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES  (continued)**

**Page**

*United States v. Norris*
428 F.3d 907 (9th Cir. 2005)                                                25, 34

*Walters v. Maass*
45 F.3d 1355 (9th Cir. 1995)                                                20

*Williams v. Taylor*
529 U.S. 362 (2000)                                                        18

*Williams v. Taylor*
529 U.S. 362 (2000)                                                        20

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                        18

*Yarborough v. Gentry*
540 U.S. 1 (2003)                                                         38

**Statutes**

28 United States Code
§ 2244(d)(1)                                                                2
§ 2254(d)(1)                                                            18, 37
§ 2254(d)(2)                                                               18

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)               18

California Evidence Code
§ 352                                                                  21, 24
§ 1101(b)                                                                 21
§ 1108                                                               1, 21, 34
§ 1108(a)                                                                 23

California Penal Code
§ 209(b)(1)                                                                2
§ 261(a)(2)                                                                2
§ 667.6(c), (d)                                                            2
§ 667.61(D)(2)                                                        1, 2, 19

**TABLE OF AUTHORITIES  (continued)**

Page

**Other Authorities**

Circuit Rule 36-3(b)                                                                35

California Jury Instructions, Criminal
        No. 2.50.01                                                          1, 33-35
        No. 2.62                                              1, 26-29, 31, 32

Fed.R.App.P. 32.1(a)                                                          35

Federal Rules of Evidence
        Rule 403                                                                 24
        Rule 404(b)                                                              24
        Rule 413(a)                                                              24
        Rule 414                                                                 24
        Rule 414(a)                                                             23

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | JOAN KILLEEN
Deputy Attorney General
6 | State Bar No. 111679
   455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-7004
   Telephone: (415) 703-5968
8 | Fax: (415) 703-1234
   Email: Joan.Killeen@doj.ca.gov
9 | Attorneys for Respondent

10 | IN THE UNITED STATES DISTRICT COURT

11 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 | SAN JOSE DIVISION

13

14 | **DERRAN SMILEY,**                        C 08-0045 RMW (PR)

                                Petitioner,

15 | 

16 |          **v.**

17 | **MIKE EVANS, Warden,**

                                Respondent.

18

19

20 | **APPLICATION FOR LEAVE TO FILE OVERSIZED MEMORANDUM OF POINTS
   AND AUTHORITIES**

21

22

23

24

25

26

27

28

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | JOAN KILLEEN
Deputy Attorney General
6 | State Bar No. 111679
   455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-7004
   Telephone: (415) 703-5968
8 | Fax: (415) 703-1234
   Email: Joan.Killeen@doj.ca.gov
9 | Attorneys for Respondent

10 | IN THE UNITED STATES DISTRICT COURT

11 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

12 | SAN JOSE DIVISION

13

14 | **DERRAN SMILEY,**                                  C 08-0045 RMW (PR)

15 | Petitioner,   **APPLICATION FOR LEAVE TO FILE OVERSIZED MEMORANDUM OF POINTS AND AUTHORITIES**

16 | **v.**

17 | **MIKE EVANS, Warden,**

18 | Respondent.

19 |         Respondent respectfully requests that this Court grant leave to file a memorandum of

20 | points and authorities in excess of 25 pages, pursuant to Civil L.R. 7-4(b).  Respondent is filing the

21 | memorandum of points and authorities in support of the answer to the petition for writ of habeas

22 | corpus filed in this case.

23 |         As set forth in the accompanying Declaration of Counsel, counsel for respondent believes

24 | in good faith that it is necessary to file the oversized points and authorities in order to fully and

25 | adequately address the issues raised by petitioner, and that good cause for the request by respondent

26 | is stated therein.

27

28

Application For Leave To File Oversized Memorandum Of Points And Authorities - C 08-0045 RMW (PR)

1    Wherefore, respondent respectfully requests that this Court grant leave to file a

2    memorandum of points and authorities in excess of 25 pages.

3        Dated:  August 7, 2008

4                    Respectfully submitted,

5                    EDMUND G. BROWN JR.
                    Attorney General of the State of California

6                    DANE R. GILLETTE
                    Chief Assistant Attorney General
7
                    GERALD A. ENGLER
8                    Senior Assistant Attorney General

9                    PEGGY S. RUFFRA
                    Supervising Deputy Attorney General

10

11                    /s/ Joan Killeen
                    JOAN KILLEEN
12                    Deputy Attorney General

13                    Attorneys for Respondent

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOAN KILLEEN
   Deputy Attorney General
6  State Bar No. 111679
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-7004
      Telephone: (415) 703-5968
8     Fax: (415) 703-1234
      Email: Joan.Killeen@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

    **DERRAN SMILEY,**                    C 08-0045 RMW (PR)
14
                             Petitioner,
15
              **v.**
16
    **MIKE EVANS, Warden,**
17
                             Respondent.
18

19    **DECLARATION OF COUNSEL IN SUPPORT OF APPLICATION FOR LEAVE TO**
20         **FILE OVERSIZED MEMORANDUM OF POINTS AND AUTHORITIES**

21

22

23

24

25

26

27

28

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   JOAN KILLEEN
    Deputy Attorney General
6   State Bar No. 111679
        455 Golden Gate Avenue, Suite 11000
7       San Francisco, CA 94102-7004
        Telephone: (415) 703-5968
8       Fax: (415) 703-1234
        Email: Joan.Killeen@doj.ca.gov
9   Attorneys for Respondent

10                  IN THE UNITED STATES DISTRICT COURT

11                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                            SAN JOSE DIVISION

13

14   **DERRAN SMILEY,**                        C 08-0045 RMW (PR)

15                              Petitioner,     **DECLARATION OF**
                                                **COUNSEL IN SUPPORT OF**
16           **v.**                             **APPLICATION FOR LEAVE**
                                                **TO FILE OVERSIZED**
17   **MIKE EVANS, Warden,**                    **MEMORANDUM OF POINTS**
                                                **AND AUTHORITIES**
18                             Respondent.

19          I, Joan Killeen, declare under penalty of perjury that:

20          I am a Deputy Attorney General of the State of California and am admitted to practice law

21   in this state and before this Court.  I have been assigned to represent respondent and to prepare the

22   answer in this case.

23          On April 28, 2008, this Court issued an Order to Show Cause, directing respondent to file

24   an answer to the petition for writ of habeas corpus.

25          The habeas petition raises six claims with respect to petitioner's convictions of kidnapping

26   to commit rape and rape (five counts), with findings that petitioner kidnapped the victim and that

27   the movement substantially increased the risk of harm to the victim over and above the level of risk

28

Declaration Of Counsel In Support Of Application For Leave To File Oversized Memorandum Of Points And Authorities
- C 08-0045 RMW (PR)

1  inherent in the commission of the offenses, and that the rapes were committed against the same

2  victim on separate occasions.  The claims, which challenge the sufficiency of the evidence as to the

3  kidnapping charge and special allegations, the admission of evidence, the trial court's instructions,

4  and the effectiveness of trial counsel, require a recitation of the facts underlying the claims, as well

5  as an analysis of the law and the state court opinion rejecting the claims.

6      The reporter's transcript on appeal is over 1,585 pages long and the clerk's transcript is

7  approximately 455 pages long.  In order to fully address petitioner's claims, as well as to argue the

8  harmlessness of any error found, respondent has found it necessary to set forth a detailed statement

9  of facts.

10     Respondent's memorandum of points and authorities is 39 pages long.  I believe that the

11  length of the memorandum is necessary to adequately set forth the facts of the underlying crimes,

12  the facts relating to petitioner's claims, the state court of appeal's ruling on those claims, the

13  applicable federal law, and respondent's argument.

14     As counsel for respondent, I believe in good faith that the length of the memorandum of

15  points and authorities is necessary to discharge my obligation to represent respondent and to fully

16  address the issues raised by petitioner.

17     Executed on August 7, 2008, at San Francisco, California.

18

19                             /s/ Joan Killeen
                               JOAN KILLEEN
20                             Deputy Attorney General

21

22

23

24

25

26

27

28

Declaration Of Counsel In Support Of Application For Leave To File Oversized Memorandum Of Points And Authorities
- C 08-0045 RMW (PR)

2

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOAN KILLEEN
   Deputy Attorney General
6  State Bar No. 111679
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5968
8    Fax: (415) 703-1234
     Email: Joan.Killeen@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13

14  **DERRAN SMILEY,**                          C 08-0045 RMW (PR)

15                              Petitioner,

16          **v.**

17  **MIKE EVANS, Warden,**

18                              Respondent.

19

20      **INDEX OF STATE COURT RECORDS LODGED IN SUPPORT OF ANSWER TO
              PETITION FOR WRIT OF HABEAS CORPUS**

21

22

23

24

25

26

27

28

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   PEGGY S. RUFFRA
    Supervising Deputy Attorney General
5   JOAN KILLEEN
    Deputy Attorney General
6   State Bar No. 111679
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA 94102-3664
      Telephone: (415) 703-5968
8   Fax: (415) 703-1234
      Email: Joan.Killeen@doj.ca.gov
9   Attorneys for Respondent

10                IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                       SAN JOSE DIVISION

13
    DERRAN SMILEY,                          C 08-0045 RMW (PR)
14
                               Petitioner,  **INDEX OF STATE COURT
15                                          RECORDS LODGED IN
            v.                              SUPPORT OF ANSWER TO
16                                          PETITION FOR WRIT OF
    MIKE EVANS, Warden,                     HABEAS CORPUS**
17
                               Respondent.
18

19                              INDEX

20      Exhibits

21          A        Clerk's Transcript on Appeal, Vols. 1-2

22          B        Reporter's Transcript on Appeal, Vols. 1-7

23          C        People's Exhibit No. 25a

24          D        Appellant's Opening Brief, A113874

25          E        Respondent's Brief, A113874

26          F        Appellant's Reply Brief, A113874

27          G        Petition for Writ of Habeas Corpus, A116804

28

| | | |
|---|---|---|
| 1 | H | California Court of Appeal Opinion, A113874 |
| 2 | I | Petition for Review, A113874 |
| 3 | J | California Supreme Court Order Denying Review, S157454 |
| 4 | K | Petition for Writ of Certiorari, No. 07-8779 |
| 5 | L | Docket Entry Showing Denial of Certiorari, No. 07-8779 |

Index Of State Court Records Lodged In Support Of Answer To Petition For Writ Of Habeas Corpus - C 08-0045 RMW (PR)

1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                   SAN JOSE DIVISION

11

12   **DERRAN SMILEY,**                          C 08-0045 RMW (PR)

13                            Petitioner,        **[PROPOSED] ORDER GRANTING**
                                                 **LEAVE TO FILE MEMORANDUM**
                                                 **OF POINTS AND AUTHORITIES**
14          v.                                   **IN EXCESS OF 25 PAGES**

     **MIKE EVANS, Warden,**
15
                             Respondent.
16

17          GOOD CAUSE APPEARING, respondent is granted leave to file a memorandum of

18   points and authorities in support of the Answer to Petition for Writ of Habeas Corpus in excess of

19   25 pages.

20          DATED: _____

21

22                                    _____
                                      RONALD M. WHYTE
23                                    UNITED STATES DISTRICT JUDGE

24

25

26

27

28

## DECLARATION OF SERVICE

Case Name:  **Smiley v. Evans, Warden**                    No.:  **C 08-0045 RMW (pr)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the Bar of this Court at which member's direction this service is made.  I am 18 years of age or older and not a party to the within entitled cause; I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **August 8, 2008**, I placed the attached **1) ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; 2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; 3) APPLICATION FOR LEAVE TO FILE OVERSIZED MEMORANDUM OF POINTS AND AUTHORITIES; 4) DECLARATION OF COUNSEL IN SUPPORT OF APPLICATION FOR LEAVE TO FILE OVERSIZED MEMORANDUM OF POINTS AND AUTHORITIES; 5) INDEX OF STATE COURT RECORDS LODGED IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; and 6) [PROPOSED] ORDER GRANTING LEAVE TO FILE MEMORANDUM OF POINTS AND AUTHORITIES IN EXCESS OF 25 PAGES** in the internal mail collection system at the Office of the Attorney General, 455 Golden Gate Avenue, Suite 11000,  San Francisco, CA 94102, for deposit in the United States Postal Service that same day in the ordinary course of business, in a sealed envelope, postage thereon fully prepaid, addressed as follows:

Derran Smiley
F-28162
Salinas Valley State Prison
P. O. Box 1050
Soledad, CA  93960-1050

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **August 8, 2008**, at San Francisco, California.

| L. SORENSEN | /s/ L. Sorensen |
|:-----------:|:---------------:|
| Typed Name  | Signature       |