In The United States District Court
for The Northern District Of California

FILED

2008 AUG 18 ⅌ 56

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

C 08-0045 RMW (PR)

Petitioner, Derran Smiley

V.

Respondent, Mike Evans, Warden.

Petitioner's Traverse And Supporting Memorandum
Of Law

### Petitioner's Traverse

Petitioner Derran Smiley hereby incorporates as set forth herein, all facts alleged in his Petition for Writ of Habeas Corpus on file in this court.

In response to the answer to Order to Show Cause filed by the respondents Attorney General, and Mike Evans, Warden (hereinafter collectively referred to as the State), Petitioner asserts the following:

Petitioner agrees that he is in the custody of the State pursuant to the judgment and order of the Superior Court of California as set forth in the answer. Petitioner denies that his custody is lawful or that the judgment and order are valid, for he asserts that said judgment, order and custody are the result of proceedings offensive to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.
Petitioner did so exhausted his available state remedies.

Petitioner asserts that his trial counsel performance was deficient by falling below an objective standard. There was no reason why trial counsel failing to object to rape trauma syndrome evidence used as substantive evidence of petitioner's guilt. Counsel's performance on petitioner's behalf violated petitioner's Constitutional Right to effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendment, which was violated.

There was serious trial errors which prevented the jury's proper consideration of petitioner's case. These error included misinstructions which impugned and detracted from the defendants Fifth Amendment right not to incriminate himself. With respect which relates to petitioner contention concerning Caljic No. 2.62. This pattern instruction allows the jury to draw an unfavorable inference if the defendant fails to explain or deny inculpatory evidence where it is within his power to do so. Also, the admission of prior acts to show a propensity to commit such act and allowed a jury to convict upon such evidence denies a criminal defendant his right to due process of law and more so, to a fair trial. Further more, there is a reasonable likelihood that the result in petitioner's case would had or have been different had those errors were not committed. As a result, petitioner reasserts that his right to due process guaranteed by the Fifth, Sixth, and Fourteenth Amendments was violated. Petitioner asserts that the State courts rejection of his claims was contrary to clearly established federal law and was unreasonable by any standard. Petitioner Smiley asserts that the Answer Filed by the State is inadequate, for it does not set out the particular facts in dispute and thus does not fully comply with the requirements of 28 U.S.C. 2254, Rule 5.

It should accordingly be struck.

Accordingly, Petitioner prays the Court to vacate the judgment of conviction and the sentence imposed upon him in Alameda County Superior Court Case No. C149560, and order his immediate release.

Respectfully Submitted
Petitioner, Dorran Smiley

Dated: 8-14-08

Table Of Authorities

## _ Cases _

pg#1,9,    Crotts V. Smith (9th Cir. 1996) 73 F.3d 861, 866

pg#1,9,    United States V. Bradly (9th Cir. 1993) 5 F.3d 1317, 1321

pg#1,9,11,    Mc Kinney V. Rees (9th Cir. 1993) 993 F.2d 1378, 1380-1385

pg#1,16,17,    Gibson V. Ortiz (9th Cir. 2004) 387 F.3d 812, 823-824

pg#3,    Jammal V. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)

pg#19,    Flores Chaves V. Ashcroft, 362 F.3d 1150, 1158 (9th Cir. 2004)

pg#33,    United States V. Dow (7th Cir 1972) 457 F.2d 246, 250

pg#26,    Eze V. Senkowski (2nd Cir. 2003) 321 F.3d 110, 131

pg#32,    Moore V. Parke (7th Cir. 1998) 148 F.3d 705

pg#2,24,    Strickland V. Washington 446 U.S. 668 (1984)

pg#2,    Ylst V. Nunnemaker, U.S. 111 S. CT. 2590, 2594 (1990)

pg#5,8,    Jackson V. Virginia (1978) 443 U.S. 307, 319

pg#9,    Snyder V. Massachusetts (1933) 291 U.S. 97, 105

pg#9,    Speiser V. Randall (1958) 357 U.S. 513, 523

pg#9,    Reno V. Flores (1993) 507 U.S. 292

pg#4,9,16,17,    In re Winship (1970) 397 U.S. 358, 362-364

pg#10,    Attorney General of New York V. Soto-Lopez (1986) 476 U.S. 898, 904

pg#3,11,    Michelson V. United States (1948) 335 U.S. 469, 475-476

pg#11,    Chapman V. California (1967) 386 U.S. 18, 24

pg#24,    Old Chief V. U.S, 519 U.S. 172, 182, 117 S. CT 644, 136 L. Ed. 2d 574 (1997)

pg#20,    Richardson V. Marsh, 481 U.S. 200, 206, 107 S. CT 1702, 95 L.Ed.2d 176 (1987)

pg#5,16,    Sullivan V. Louisiana (1993) 508 U.S. 275, 281

pg#32,    Strickland, supra, 466 U.S. at pg 687-688

pg#33,    Griffin V. California (1965) 380 U.S. 609

pg#34,    Fahy V. Connecticut (1963) 375 U.S. 85, 86-87

pg#19,    Francis V. Franklin, 471 U.S. 307, 105 S. CT. 1965, 85 L. Ed. 2d 344 (1985)

pg#16,    Yates V. Evatt (1991) 500 U.S. 391, 404-405

(ii)

## — Cases —

pg 34,   Chapman V. California, supra, 386 U.S. at p. 24

pg 7,   People V. Daniels (1969) 71 Cal. 2d 1119, 1130-1131

pg 7,   People V. Stanworth (1974) 11 Cal. 3d 588, 598

pg 6,   People V. Diaz (2000) 78 Cal. App. 4Th = 243

pg 6,   People V. Dominguez (2006) 39 Cal. 4Th 1141

pg 6,   People V. Diaz supra, 78 Cal. App. 4Th at p. 246

pg 9,   People V. Falsetta (1999) 21 Cal. 4Th 903, 911-912

pg 7,   People V. Dominguez, supra, at p. 1154-1155

pg 7,   In re Earley, supra, 14 Cal. 3d at p. 132 Fn. 15

pg 8,   People V. Martinez (1999) 20 Cal. 4Th 225, 237

pg 7,   People V. Falsetta, supra 21 Cal. 4Th 903, 916-918

pg 10,   Murphy V. Pierce (1991) 1 Cal. App. 4Th 690, 694

pg 11,   People V. Watson (1956) 46 Cal. 2d 818, 836

pg 26,   People V. Bledsoe (1984) 36 Cal. 3d 236, 251

pg 26,   People V. Roscoe (1985) 168 Cal. App. 3d 1093, 1100

pg 26,   People V. Jeff (1988) 204 Cal. App. 3d 309, 331-332

pg 32,   Anderson, supra, 25 Cal. 4Th at p. 569

pg 33,   People V. Tealer, supra, 48 Cal. App. 3d at p. 604

pg 11,   People V. Cramer (1967) 67 Cal. 2d 126, 129

pg 11, 12,   People V. Ewoldt (1994) 7 Cal. 4Th 380, 414

pg 34,   People V. Haynes (1983) 148 Cal. App. 3d 1117, 1119

pg 34,   People V. Saddle (1979) 24 Cal 3rd 671, 685

pg 7, 34,   People V. Lamer (2003) 110 Cal. App. 4Th 1463, 1470

pg 34,   People V. Kondor (1988) 200 Cal. App. 3d 52, 57

pg 6,   Neal V. State Of California (1960) 55 Cal. 2d 11, 19

pg 7,   People V. Jones supra, 58 Cal. App 4Th 693

(iii)

## Cases

pg 4,5   Winship, 397 U.S. at 364, 90 S.CT. 1068

pg 4   Middleton v. McNeil, 541 U.S. 433, 124 S.CT. 1830, 1832, 158 L.Ed.2d

pg 9   701 (2004)

pg 4,5   Taylor v. Kentucky, 436 U.S. 478, 485-86, 98 S.CT. 1930, 56 L.Ed. 2d

pg 9   468 (1978)

pg 4   Cool v. United States, 409 U.S. 100, 104, 93 S.CT 354, 34 L.Ed. 2d

335 (1972).

pg 4   Victor v. Nebraska, 511 U.S. 65, 114 S.CT. 1239, 127 L.Ed.2d

583 (1994)

pg 4   Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.CT. 396, 38 L.Ed.2d

368 (1973)

pg 5,   Cage v. Louisiana, 498 U.S. 39, 111 S.CT. 328, 112 L.Ed. 2d 339 (1990)

pg 4,   Estelle, 502 U.S. at 72, 112 S.CT. 475

pg 4,   Sullivan, 508 U.S at 281, 113 S.CT 2078

pg 12,   Boyd v. United States 142 U.S, 450, 458, 12 S.CT. 292, 295, 35 L.Ed 1077 (1892)

pg 21,   Boyde, 494 U.S. at 379-80, 110 S.CT 1190

Constitutions, Statutes And Rules

United States Constitution - Amendments - Five, Six, and Fourteen  pg 4, 5, 9, 10, 33, 35

California Constitution - Article 1, section 7 and 15  pg 9, 10, 33

28 U.S.C. 2254, Rule 5 (AEDPA)  pg 1, 2

Antiterrorism And Effective Death Penalty Act Of 1996 (AEDPA)  pg 1

Other Authorities

Black Law Dictionary at 842 (6th Ed. 1990)  pg 2,

Historical Note, 29B pt. 3, West's Ann Evid Code 1108, (1998 pocket.) p. 31.)  pg 17,


Cal. Jury Instructions - Criminal (CALJIC)

2.50.01, 2.50.1, 2.50.2, 2.62  pg 5, 16, 19, 32,

10.65  pg 35

California Penal Codes

section - 667.61 (D)(2)  pg 6,

section - 209 subd (D)  pg 6,


California Evidence Codes

section - 1108  pg 9, 10, 17, 31,

section - 1101 subd (D) Exception and subd (A) and (B)  pg 9, 11, 14, 32,

section - 352  pg 17

section - 654  pg 6,

section - 413  pg 35

Memorandum Of Law In Support Of Traverse

## Table Of Contents

pg 1     The State Has Misstated The Standard Of Review
         Under 28 U.S.C. 2254(D).
                                        (Transcripts Attached)

pg 6     The Court of Appeal erred in holding that sufficient
         evidence supported the aggravated kidnapping conviction
         and true findings on the kidnap enhancement allegations
         under section 667.61(D)(2), Petitioner was deprived due process.
                                        (Transcripts Attached)

pg 9     The Court of Appeal erred in holding that petitioner was
         not deprived of due process and a fair trial when uncharged
         conduct evidence was admitted against him pursuant to
         evidence code section 1108.
                                        (Transcripts Attached)

pg 16    The Court of Appeal erred in holding that CALJIC NO. 2.50.01
         given to appellants jury deprived him of due process and
         a fair trial by misstating the burden of proof for conviction.
                                        (Transcripts Attached)

pg 25    The Court erred in holding that appellant was not denied
         due process or his sixth amendment right to the effective assistance
         of counsel by counsel's failure to object to the use of rape
         trauma syndrome evidence as substantive evidence of guilt.
                                        (Transcripts Attached)

pg 32    The Court violated petitioner fifth amendment right against
         self-incrimination when it instructed the jury to speculate
         about his silence and construe his silence against him.
                                        (Transcripts Attached)

pg 10    Evidence Code 1108 violates due process of law on its face and
         in this case.

_Memorandum Of Law In Support Of Traverse_

Ignoring pertinent Ninth Circuit precedent, the law is not as the State court and State presents it. While the state has not spoken definitively regarding all aspects of the statutory amendments, the Ninth Circuit has clearly stated and considered and rejected the interpretation now urged by the state. (see, Crotts v. Smith 9th Cir. 1998) 73 F. 3d 861, 866 (quoting, United States v. Bradley (9th Cir. 1993) 5 F. 3d 1317, 1321, (which stated in words equally applicable to the instant case.) see, Mc Kinney v. Rees (9th Cir 1993) 993 F. 2d 1378, 1380, 1385.) (Also see, Gibson v. Ortiz (9th Cir 2004) 387 F. 3d 812, 823-824.) To understand what is at issue, and what the law really provides, we stated the pertinent portion of the statute:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: 2.) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.) resulted in a decision that was based on a unreasonable determination of the facts in light of the evidence presented in the state court proceeding. (28 U.S.C. 2254 (D) as amended by Antiterrorism and Effective Death Penalty Act, 1996 (AEDPA).

Under the plainest and most consistant reading of the statutory language, a state court decision is contrary to clearly established Federal law whenever it is directly governed by, and is contrary to, an established United States Supreme Court holding. The Ninth Circuit has repeatedly interpreted the amended statute in precisely this fashion. Thus the Ninth Circuit has held

that de novo review of the state courts denial of a claim of
ineffective assistance of counsel is not precluded by the AEDPA amendments,
because Strickland V. Washington, 446 U.S. 668 (1984) has long been clearly
established federal law determined by the Supreme Court of the United States.
By parity of reasoning, petitioner is entitled to de novo review of all his
claims. Also again, he was denied due process when the state failed
to exclude evidence that was highly prejudicial to petitioner's case
and should not have been admitted.
   A decision is defined as a conclusion of law upon facts.

Black Law Dictionary at 842 (6th Ed. 1990).
The language thus clearly imports not just a result, but a visible
reasoning process that can be evaluated by the federal courts.
Without that, it is neither sensible nor even possible to ascertain
whether and to what degree the state court's determination deserves
credence. As the Supreme Court noted, sometimes the members of the
court issuing an unexplained order will not themselves have agreed upon
it's rationale, so that the basis of the decision is not merely undiscoverable
but non-existent. (Ylst V. Nunnemaker, U.S. III S. Ct. 2590, 2594 (1990).

Thus the extraordinary deference which the state seeks is plainly inappropriate.
Guilt in a criminal case must be proved beyond a reasonable doubt
and by evidence confined to that which long experience, has crystallized
into rules of evidence consistente with that standard. These rules
are historically grounded rights of our system, developed to safeguard
men from dubious and unjust convictions, with resulting forfeitures
of life, liberty and property. The rule against using character evidence
to show behavior in conformance therewith, or propensity, is one such

historically grounded rule of evidence. It has persisted since at least 1684 to the present, and is now established not only in the Federal and California evidence rules, but in the evidence rules of thirty-seven other states and in the common-law precedents of the remaining twelve states in the District of Columbia. Previously the Ninth Circuit held that only if there are no permissible inferences the jury may draw from the evidence can its admission violates due process. (Jammal V. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Because drawing propensity inferences from other acts evidence of character is impermissible under an historically grounded rule of Anglo-American jurisprudence. There are no permissible inferences the jury could have drawn from the character evidence discussed above. The admission of this evidence, therefore, could have violated due process. Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of a defendants evil character to establish the probability of his guilt. The state may not show defendants prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant, on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. (Michelson V. United States, 335 U.S. 469, 475-476, 69 S.CT. 213, 218, 93 L.Ed.) More so, Ninth Circuit cases are decisions by the federal court of appeals for this federal judicial district. As such they are the law, here in this court. As more so is the United States Supreme Court.

(4)

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove every element charged in a criminal offense beyond a reasonable doubt, a proposition of which there could be no doubt when defendant was tried (see Winship, 397 U.S. at 364, 90 S.Ct. 1068.) If the jury is not properly instructed that a defendant is presumed innocent until proven guilty beyond a reasonable doubt, the defendant has been deprived of due process. (see Middleton V. McNeil, 541 U.S. 433, 124 S.CT. 1830, 1832, 158 L.Ed.2d 701 (2004); Taylor V. Kentucky, 436 U.S. 478, 485-86, 98 S.CT 1930, 56 L.Ed. 2d 468 (1978). Any jury instruction that reduces the level of proof necessary for the Government to carry its burden is plainly inconsistent with the constitutionally rooted presumption of innocence. (Cool V. United States, 409 U.S. 100, 104, 93 S.CT. 354, 34 L.Ed. 2d 335 (1972).

Although the Constitution does not require jury instruction to (contain) contain any specific language, the instructions must convey both that a defendant is presumed innocent until proven guilty and that he may only be convicted upon a showing of proof beyond a reasonable doubt. (see Victor V. Nebraska, 511 U.S. 1, 5, 114 S.CT. 1239, 127 L.Ed.2d 583 (1994). The essential connection to a beyond a reasonable doubt factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates all the jury's findings. Sullivan, 508 U.S. at 281, 113 S.CT 2078 (emphasis in original). Where such an error exists, it is considered structural and thus is not subject to harmless error review. (see id. at 280-82, 113 S.Ct. 2078. However, if a jury instruction is deemed ambiguous, it will violate due process only when a reasonable likelihood exists that the jury has applied the challenged instruction in a manner that violates the constitution. Estelle, 502 U.S. at 72, 112 S.CT. 475. Any challenged instruction must be considered in light of the full set of jury instructions and the trial record as a whole. (see Cupp V. Naughten, 414 U.S. 141, 146-47, 94 S.CT. 396, 38 L.Ed. 2d 368 (1973).

(14)

The Ninth Cir hold that the 1996 version of CALJIC No. 2.50.01 runs directly contrary to Winship's maxim that a defendant may not be convicted except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. ( Winship, 397 U.S. at 364, 90 S. CT 1068; see also Taylor, 436 U.S. at 485-86, 98 S. CT. 1930. The due process clause of the Fourteenth Amendment must be held to safeguard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.

It is said that CALJIC No. 2.50.01 permits the jury to find defendant's guilty of the charged offenses by merely a propenderance of the evidence and therefore constitutes structural error within the meaning of Sullivan. (see Sullivan 508 U.S. at 281-82, 113 S. CT. 2078. In Sullivan, the trial court gave the jury a definition of reasonable doubt that had previously been held as unconstitutional in Cage v. Louisiana, 498 U.S. 39, 111 S.CT. 328, 112 L. Ed. 2d 339 (1990). The Supreme court tied the Fifth Amendment requirement of proof beyond a reasonable doubt to the Sixth Amendment right to a jury trial, holding that the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt. Id. at 278, 111 S.CT. 328 (emphasis added). A Sullivan error precludes harmless error review because no verdict within the meaning of the Sixth Amendment has been rendered. Id. at 280, 113 S. CT. 2078; see also Jackson v. Virginia, 443 U.S. 307, 320 n. 14, 99 S.CT. 2781, 61 L. Ed. 2d 560 (1979)

1.) The Court of Appeal erred in holding that sufficient evidence supported the aggravated Kidnapping Conviction and True Findings on the Kidnap Enhancement Allegations Under section 667.61 (0)(2) Petitioner was deprived due process.

In the court of appeal, appellant contended that there was insufficient proof that the movement of the victim was more than incidental to the commission of the crime of rape. Therefore, his conviction of aggravated Kidnapping for rape, 209 subd (A) and the jury's finding of true on the one strike Kidnap enhancements (667.61 subd (0)(2) for the others rape charges needed to be vacated. The appellante court held to the contrary on the basis of case law which must be clarified. The court opinion refers to the precedents of People V. Diaz (2000) 78 Cal. App. 4TH 243 and People V. Dominguez (2006) 39 Cal. 4TH 1141. (Slip opin pp. 11-12) However, the difficulty with those cases is that neither of them address the particular problem identified by petitioner. Kidnapping for purpose of robbery or a sexual offense requires movement of the victim that is beyond that merely incidental to the commission of and increases the risk of harm to the victim over and above that necessarily present in the intended underling offense. (209 subd (D)) This is also an element of the Kidnap enhancement of section 667.61 subd (0)(2). People V. Diaz, supra, 78 Cal. App. 4TH at p.246.) More so this is at issue, the Supreme Court has interpreted section 654 to apply not just when there is only one act, but also when there is a course of conduct that violates more than statute but nevertheless constitutes an indivisible transaction. (Neal V. State of California (1960) 55 Cal. 2d 11, 19.) Whether a course of conduct is indivisible depends on the actor's intent and objective. If all the offenses were incident to one objective, the defendant may be punished for one of such offenses but not for more than one.

This court is urged to see (People V. Latimer (1993) 5 Cal. 4th 1203, 1211 [where defendant kidnapped victim for purpose of rape, drove the victim a considerable distance into the desert, and raped her there, defendant could be punished for rape but not the kidnapping because the objective of the kidnapping was to commit rape.) The essential point which our case law has yet to address pertains to the homely fact that practically all sex crimes are committed in secret, or in seclusion. (see. People V. Falsota (1999) 21 Cal. 4th 903, 911-912 [ re secret nature of sex crimes.]) It can never be enough as the court recognized in Dominguez, that the defendant move the victim a particular distance, even a far distance. (People V. Dominguez, supra, at pp 1154-1155.) Instead, each case must be evaluated on its own facts. Petitioner urge this court to take the next step and recognize, as petitioner urged above and below, that the movement of the complaining witness from a public sidewalk to a nearby park must be viewed as incidental to the commission of the crime of rape. While nobody should commit such a crime in the first place, ■ comparative safety to affect the crime. (see. People V. Daniels (1969) 71 Cal. 2d 1119, 1130-1131; People V. Stanworth (1974) 11 Cal. 3d 588, 598 [ movements incidental to rapes and robberies insufficient evidence of asportation.]) While removal of the victim from public view may be a relevant (although in itself an insufficient circumstance)(In re Earley, supra 14 Cal. 3d at p.132 fn. 15; People V. Jones supra, 58 Cal. App. 4th 693. Accordingly, the risk of harm test is satisfied when the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon. In the case at hand, no weapon was used, there was no evidence to show that the victim was in public view. The night was dark, and there was no evidence that any other people was around before appellant and the victim went to the park.

see. People v. Martinez (1999) 20 Cal 4ᵀᴴ 225, 237 ["no evidence that the victim relatively brief movement of the victim here removed her from public view].)

Neither the conviction nor the enhancements were supported by substantial evidence. This court is ask to reverse the conviction under the Federal Constitution as not supported by substantial evidence. (Jackson v. Virginia (1979) 443 U.S. 307, 319.)

2.) The Court of Appeal erred in holding that appellant was not deprived of due process and a fair trial when uncharged conduct evidence was admitted against him pursuant to evidence code sec. 1108. (Ref: slip op. pp. 12-14)

The court of Appeal upheld the trial courts admission of uncharged conduct evidence on the basis of Evidence code sec. 1108. In People V. Falsetta, supra, 21 Cal. 4th 903, 916-918, that court up held section 1108 on due process grounds. That provision authorizes admission into evidence of pretheior sex crimes to prove criminal propensity to commit such acts. However, the admission of prior acts to show a propensity to commit crime and to allow a jury to convict upon such evidence denies a criminal defendant his right to due process of law and to a fair trial. (Cal. Const. art. 1, 7, and 15,) U.S. Const. Amends 5 and 14, Mc Kinney V. Rees (9th Cir. 1993) 993 F. 2d 1378, 1380-1385.)

To that extent, Falsetta is wrongly decided. The contention that admission of prior bad acts soley to show criminal propensity is violative of Federal due process standards. The due process clause of the fifth and fourteenth amendments to the United States Constitution prohibits state procedures which offend the principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. (Snyder V. Massachusetts (1933) 291 U.S. 97, 105, (Speiser V. Randall (1958) 357 U.S. 513, 523, Reno V. Flores (1993) 507 U.S. 292.) The due process clause requires proof of a criminal charged beyond a reasonable doubt. (In re Winship (1970) 397 U.S. 358, 362.)

The evidence was inadmissible under evidence code section 1101, ■ subd. (O) Exception. The prior offense evidence involved here had no probative value other than the impermissible inference which may be drawn from propensity to specific criminality. (Evid. Code 1101, subd. (A). This evidence was simply too generic and non-probative for purposes of the statute. The reviewing court in Crotts V. Smith (9th Cir. 1996) 73 F. 3d 861, 866 stated in words equally applicable to the instant case:

The defendant must be tried for what he did, not by who he is. Thus, guilt or innocence of the accused must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other act of wrongdoing. (quoting, United States V. Bradley (9th Cir 1993) 5 F. 3d 1317, 1321.)

Evidence code 1108 violates due process of law on its face and in this case. Evidence code section 1108 also violates equal protection of the laws as guaranteed by the 14 amendment and article 1, section 7 of the California Constitution. It removes from protection against character evidence of persons who are accused of certain sexual offenses who also have allegedly committed sex offenses in the past. This is disparate treatment of those accused of sexual offense from all others accused of criminal offenses. This disparate treatment violates the United States and California guarantees of the equal protection of the laws. The basic principle behind constitutional equal protection is that persons similarly situated with respect to the legitimate purpose of the laws receive like treatment. (see. Murphy V. Pierce (1991) 1 Cal. app. 4th 690, 694.) The fact that a criminal defendant is charged with a sex offense does not make him constitutionally dissimilar from those charged with other crimes. All defendants are similarly situated with respect to the rules of evidence in that each defendant has the right to a fair trial guided by rational rules of evidence. When a state law infringes a constitutionally protected and fundamental right, that law is subject to strict scrutiny under the Equal Protection Clause. (see. Attorney General of New York V. Soto-Lopez (1986) 476 U.S. 898, 904.) Evidence code section 1108 treats those accused of a sexual offense differently from all other criminal defendants by allowing evidence of alleged other offenses to be admitted for all purpose including showing a propensity to commite crime. The admission of such evidence impinges upon such a defendant's constitutional rights to a fair trial, due process of law, and the requirement

that the case be proved against him beyond a reasonable doubt.

Nothing justifies treating those accused of sexual offenses differently from those accused of murder, violent assault, burglary, or violent against children. This is unlawful discrimination which violates the State and Federal guarantee to equal protection of the laws. This prior offense evidence created a substantial risk that appellant would be convicted on the basis of his prior misconduct, in violation of Federal due process and equal protection. (McKinney V. Rees (9ᵗʰ Cir 1993) 993 F.2d 1378, see also, Michelson V. United States (1948) 335 U.S. 469, 475-476.)

Evidence that appellant in the past had committed some sexual misconduct was quite apt to convince the jury that he probably did it again. Reversal is required under Chapman V. California (1967) 386 U.S. 18, 24 or People V. Watson (1956) 46 Cal. 2d 818, 836 Standards.

Evidence as to a person's character, including specific instances of uncharged misconduct, is inadmissible to prove his or her conduct on a specified occasion. (Evid. Code 1101, subd. (A). In order to be lawfully admitted, evidence of prior bad acts committed by a defendant must be relevant to prove some fact <u>other than</u> the defendant's disposition to commit such acts. (Evid. Code 1101 subd (B). The purpose for this rule is threefold : (1) To avoid placing the accused in the position where he must defend against uncharged offenses; (2) To guard against the probability such evidence would prejudice him in the eyes of the jury, and (3) To promote judicial economy by excluding proof of extraneous evidence. (People V. Cramer (1967) 67 Cal. 2d 126, 129.)

Evidence of uncharged offenses is so prejudicial that its admission requires extremely careful analysis. (People V. Ewoldt (1994) 7 Cal. 4ᵗʰ 380, 414.)

It must be noted that appellant suffered <u>no</u> criminal conviction from the uncharged conduct evidence. In the context of this trial, this actually

increased the prejudicial impact of its introduction. In Ewoloff, the California Supreme Court concluded that generally, as to uncharged misconduct, there is a presumption that if one has not previously suffered a conviction as a result of the activity, the evidence will be more prejudicial.

If the jury is aware that the defendant has suffered a conviction for the prior conduct, there is a reduced risk that the jury will punish the defendant in the current trial for those prior acts. There is also a reduced risk that the jury will suffer confusion. (People V. Ewoloff, supra, 7 Cal 4th at pp. 404-405.)

Thus, there was a greater risk that the jury would want to punish appellant for acts which had nothing to do with the charges he was facing.

The inflammatory potential of the evidence, however, was extreme. The court abused its discretion in admitting it.

As applied here, section 1108 unduly reduced the prosecution's burden of proof, improperly permitted conviction based solely upon character evidence and status, and deprived appellant of a fair trial. The propensity evidence added nothing except undue prejudice to the jury's determination on appellant's guilt in this case.

As shown previously, Evidence Code section 1101, subd (A) protects a person from the admission of character evidence if offered only to show propensity to commit crime.

What happen to petitioner in his trial was a disparate treatment to convict. Boyd V. U.S, 142 U.S. 450, 458, 12 S.CT. 292, 295, 35 L.Ed. 1077 (1892) (finding prior crimes committed by defendant so prejudiced, their trial require reversal).

```
 1        Now, in terms of this kidnapping clause, if the
 2   defendant is guilty in counts two, three, four, five or
 3   six, you must make a finding of whether or not the
 4   victim was kidnapped prior to each crime being
 5   committed.
 6        The only difference, the only difference between
 7   kidnapping clauses on each rape and the first count,
 8   kidnapping to commit rape, is that with each of these,
 9   you don't have to find specific intent.  The law makes
10   it even easier for you.  In other words, you don't have
11   to find he had the specific spent to rape her when he
12   moved her.  That's eliminated.  So, you don't need to
13   worry about that at all.
14        So, what does that leave you with?  The kid-
15   napping clause.  Chanelle was moved by force or fear;
16   the movement was without her consent; the movement was
17   substantial; and the movement increased the risk of harm
18   to her.
19        Just like we saw with kidnapping to commit rape,
20   except there is that element of specific intent.  You
21   don't have to find that at all, and makes it even easier
22   for you.
23        You have heard other evidence in this case other
24   than what just happened to Chanelle, and there are
25   different reasons why you have heard that evidence.
26        One of them, as I told you about in the beginning
27   of this case, was to show you what kind of person Derran
28   Smiley is.  He is a man that the law has says has a
```

1  disposition to commit sexual offenses.  In plain terms,

2  he is a sexual predator.  He has done it before, and he

3  did it again to Chanelle.

4      We heard first -- we talked first about Michelea

5  Doe.  That was the first in time in 1998 where he forced

6  an eight-year-old child to orally copulate him, or he

7  raped an eight-year-old child.

8      Now, you heard what Mr. Smiley said in that rape

9  in 1998.  He tried to get them to believe at that, time

10 just like he's trying to get one of you, two of you, any

11 number of you to believe in this case, that Michelea

12 consented.

13     He is trying to get you to believe that Chanelle,

14 despite all of the evidence that has been put in front

15 of you, somehow consented to what he did to her.

16     His story then is as ridiculous as his story now:

17 An eight-year-old child coming on to him, an eight-year-

18 old child unbuttoning his pants; an eight-year-old child

19 jumping on him and rubbing herself against him.  It's

20 ludicrous, just as it's ludicrous that Chanelle would

21 consent to the acts that he forced her into.

22     Now, the defense is going to tell you, Michelea

23 in the videotape, she said that Terran was the one who

24 took her to the park, and when she got on the stand, she

25 said that Derran was the one who took her to the park.

26     That's true.  She did it.  But what is consistent

27 about Michelea on the CALICO tape and about what she's

28 testified to?  What is undeniable is that both brothers

GERALD A. DOHRMANN, C.S.R. #2046

DA Instruction
(15)

1  sexually assaulted her.  She consistently says Derran

2  Smiley forced her to her knees as an eight-year-old in

3  that bathroom and ordered her to suck on his penis.  She

4  said that he raped her, in addition to Terran -- no

5  doubt about that -- but he did, as well.

6       His tape admits doing everything but that, going

7  sofar as to say, "Well, she tried to make me put my

8  penis in her, but it wouldn't fit."

9       Michelea Doe and Shardea Doe were Terran Smiley's

10  and Derran Smiley's sexual play things as eight-year-

11  olds.  When they were 15, when they were bigger, when

12  they were stronger, when they knew better, they have

13  profoundly -- he has profoundly impacted her life, just

14  as he has Minako and just as he has Chanelle, because

15  that's who he is.  That is what he does.

16       And then there is Minako a few years later.  You

17  heard from her and you saw her on the stand, and you saw

18  a very reserved woman, a very courageous woman, just as

19  Michelea was.  Tried to tell us what happened to her at

20  his hands years later.  You saw what kind of pain that

21  caused her.

22       Look at these similarities, ladies and gentlemen.

23  Look at these similarities between what he did to Minako

24  and what he did to Chanelle:  Both are young female

25  victims.  Both are raped in a distinct, unique location:

26  In a park.  Both at night.  Both in a darkened location.

27  Both prevented from fleeing.

28       Remember, he trips, tackles, somehow gets

3) The Court of Appeal erred in holding that CALJIC No. 2.50.01 has given to appellant's jury deprived him of due process and a fair trial by misstating the burden of proof required for conviction. (Ref: slip opinion, pp. 14-15)

This issue is reviewable as affecting appellant's substantial rights. In combination with other instructions, notably Caljic Nos. 2.50.1 and 2.50.2, and 2.50.01 permitted appellant's jury to find by a preponderance of the evidence that appellant committed the prior uncharged crimes which the prosecution introduced. It then permitted the jury to infer from his commission of these prior crimes that he had a disposition to commit such crimes and to infer from such disposition that he did commit the charged crimes without necessarily being convinced beyond a reasonable doubt that he committed the charged crimes. If the jury followed these instructions literally and arrived at a guilty verdict in that manner, appellant was denied his due process right to require proof beyond a reasonable doubt of every fact necessary to constitute the charged crimes. (In re Winship (1970) 397 U.S. 358, 364; see. Gibson V. Ortiz (9th Cir. 2004) 387 F.3d 812, 823-824 [Unconstitutional.] The central difficulty with 2.50.01 is that it tells the jury that, if you find that defendant had this disposition [to commit sexual offenses], you may, but are not required to, infer that he was likely to commit and did commit the crimes of which he is accused. Although the legislature in enacting evidence code section 1108 authorized the admission of evidence of past sexual offenses, it in no wise authorized a jury to disregard the standard of beyond a reasonable doubt. Because there's no way of knowing whether appellant's jury applied the correct burden of proof, his convictions must be reversed. (Sullivan V. Louisiana (1993) 508 U.S. 275, 281..

Moreso, it is nevertheless true that the jury must be properly instructed that evidence of prior offenses is not sufficient to prove guilt of the charge

crime beyond a reasonable doubt. This is essential to prevent the lessening of the prosecution's burden of proof. (see Gibson V. Ortiz (9th Cir. 2004) 387 F.3d 812, 823-824 [ holding pre-1999 of CALJIC NO. 2.50.01 unconstitutional.) However, additional cautionary language was contained in the 1999 revision. (2 CT 352; 7 RT 1455-1452.)

Unfortunately, this newly added cautionary language was not sufficient to remove the instruction out of the realm of unconstitutionality. The 2002 revision still contains offending language dealing with propensity evidence ( likely to commit and did commit the crimes of which he is accused). This instruction told the jury that it could find that a person who had committed a prior sexual offense is likely (that is, more likely than not ) to have committed the charged offenses. Under this instruction, if the jury finds that the person committed the past offense, it need to look no further, it can find that he is likely to have committed this one. This is not a correct statement of the law. The instruction subverts the Fifth Amendment due process requirement that proof of guilt be beyond a reasonable doubt (In re Winship, supra, 397 U.S. 358, 363-364) by allowing an inference that guilt is "likely" solely upon a showing that the defendant committed a prior offense. (Historical Not, 29 B pt. 3, West's Ann. Evid. Code 1108, (1998 pocket.) p. 31) While section 1108 reverses the presumption against the admission of evidence of prior bad acts in sex cases, and allows their admission for all relevant purposes (subject to balancing under Evidence code section 352), it was never intended to go beyond that to interfere with the presumption of innocence or to allow that guilt to be established by a lesser standard than reasonable doubt. Appellant respectfully submits this court should find that this instruction, which misstated the use to which such evidence may be put in a manner that undermines the presumption of innocence and the

reasonable doubt standard, was constitutionally infirm.

The instructional error identified here should be deemed structural error, because the jury was allowed to convict Smiley of these sexual offenses based solely upon a finding that he committed prior sexual offenses. Misinstruction on the burden of proof necessary to find the defendant guilty is reversible per se. (Sullivan V. Louisiana, supra.)

Where the jury receives wrong instructions on the burden of proof constitutionally required for a conviction, there has been no jury verdict within the meaning of the Sixth Amendment.

Even under the test of Chapman V. California, supra, 386 U.S. 18, 24, this court cannot say beyond a reasonable doubt that the error in the instruction was unimportant in relation to everything else the jury considered. (Yates V. Evatt (1991) 500 U.S. 391, 404-405.)

Contrary to the Attorney General's assertions, that the jury was given instructions regarding the presumption of innocence, the meaning of beyond a reasonable doubt, and the use of circumstantial evidence, does not offset the preponderance instruction given in Caljic No. 2.50.1. That instruction, read together with Caljic No. 2.50.01, permitted an impermissible inference. The explicit language of Caljic No. 2.50.1 carves out of the general reasonable doubt standard, a specific exception for prior evidence of sexual abuse, which carries only a preponderance burden. (see, Flores-Chavez V. Ashcroft, 362 F. 3d 1150, 1158 (9Th Cir 2004). Francis V. Franklin, 471 U.S. 307, 105 S.CT. 1965, 85 L. Ed. 2d 344 (1985), supports application of this principle to jury instructions. There, the Supreme Court held that the use of a contrary general instruction does not automatically cure a deficient specific instruction. In holding that the general instruction-instructions regarding the government burden of proof did not cure the specific defects in the language that allowed the government to impermissibly shift the burden of proof to the defendant, the court stated:

Nothing in these specific sentences or in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other. Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.

Id. at 322, 105 S.CT. 1965 (emphasis added).

Because the trial court offered no explanation harmonizing the two burdens of proof discussed in the jury instructions, the jury was presented with two routs of conviction, one by a constitutionally sufficient standard and one by a constitutionally deficient one.

As Francis makes clear, that the trial court instructed the jury generally with the correct standard does not mean that due process was not violated when an exception to that standard was not only presented to the jury, but offered as a possible means of conviction.

When viewed as a whole, there is nothing ambiguous or confusing about the challenged instructions. Caljic 2.50.01 and 2.50.1 told the jury exactly which burden of proof to apply. However, contrary to the Supreme Court's clearly established law, the burden of proof the instructions supplied for the permissive inference was unconstitutional. In this situation, Smiley's trial was impermissibly tainted by irrelevant evidence such that it is more than reasonably likely that the jury did not follow its instructions to weigh all the evidence carefully, but instead skipped careful analysis of the logical inferences raised by circumstantial evidence and convicted Smiley on the basis of his suspicious character or previous acts, in violation of our community's standard of fair play. (see Richardson V. Marsh, 481 U.S. 200, 206, 107 S. CT. 1702, 95 L. Ed. 2d 176 (1987) (noting the almost invariable assumption of the law that jurors follow their instructions), and proceeded on the basis that if it found Smiley had committed prior sexual offenses, it was then permitted to infer that Smiley had committed the charged offenses.

Not a correct statement of the law.

Old Chief v. United States, 519 U.S 172, 182, 117 S.CT 644, 136 L. Ed. 2d 574 (1997) (stating in dicta that there is no question that propensity would be a improper basis for conviction.)

Caljic No. 2.50.01 gave the jury an alternate means of conviction with a lesser standard of proof than is required by the constitution.

When a court gives the jury instructions that allow it to convict a defendant on an impermissible legal theory, as well as a theory that meets constitutional requirements, the unconstitutionality of any of the theories requires that the conviction be set aside. (Boyde, 494 U.S. at 379-80, 110 S.CT. 1190. More so, Caljic No. 2.50.01 is contrary to Winship and Sullivan.

person of bad character or that he had a disposition to
commit crimes.  It may be considered by you for the
limited purpose of determining if it tends to show:

A characteristic method, plan or scheme in the
commission of criminal acts similar to the method, plan
or scheme used in the commission of the offense in this
case, which would further tend to show the existence of
criminal intent, which is a necessary element of the
crime charged, or a clear connection between the other
offense and the one for which the defendant is accused,
so that it may be inferred that if the defendant
committed the other offense, the defendant also
committed the crime charged in this case.

The existence of criminal intent.

That the defendant did not reasonably and in good
faith believe that the person with whom he engaged or
attempted to engage in a sexual act consented to such
conduct.

For the limited purpose for which you may
consider such evidence, you must weigh it in the same
manner as you do all other evidence in this case.

Evidence has also been introduced for the purpose
of showing that the defendant engaged in a sexual
offense on one or more occasions other than that charged
in this case.

"Sexual offense" means a crime under the laws of
the state or of the United States that involves any of
the following:

1    Any conduct made criminal by Penal Code sections

2    261(a)(2), rape by force or threats, instruction 10.00;

3    261.5(c), unlawful sexual intercourse, instruction

4    10.40.1; 288a(c)(2), oral copulation by force or

5    threats, instruction 10.10; or 286(b)(1), sodomy with a

6    minor under 18, instruction 10.47.   The elements of

7    these crimes are set forth elsewhere in these

8    instructions.

9    "Sexual offense" also includes contact without

10    consent between the genitals of the defendant and any

11    part of another person's body.

12    If you find that the defendant committed a prior

13    sexual offense, you may, but are not required to, infer

14    that the defendant had a disposition to commit sexual

15    offenses.   If you find that the defendant had this

16    disposition, you may, but are not required to, infer

17    that he was likely to commit and did commit the sexual

18    offense or offenses of which he is accused.

19    However, if you find by a preponderance of the

20    evidence that the defendant committed a prior sexual

21    offense or offenses, that is not sufficient by itself to

22    prove beyond a reasonable doubt that he committed the

23    charged crimes.   If you determine an inference properly

24    can be drawn from this evidence, this inference is

25    simply one item for you to consider along with all the

26    other evidence in determining whether the defendant has

27    been proved guilty beyond a reasonable doubt of the

28    charged crimes.

(24)

Unless you are otherwise instructed, instruction 2.50, you must not consider this evidence for any other purpose.

Within the meaning of the two preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that the defendant committed sexual offenses other than those for which he is on trial.

You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that the defendant committed the other sexual offenses.

If you find other sexual offenses were committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before a defendant can be found guilty of any sexual offense charged in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime.

"Preponderance of the evidence" means evidence that has a more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it.

You should consider all of the evidence bearing on every issue regardless of who produced it.

The definition of some of those other crimes that

4) The Court of Appeal erred in holding that appellant was not denied due process or his sixth amendment right to the effective assistance of counsel by counsel's failure to object to the use of rape trauma syndrome evidence as substantive evidence of guilt. (Ref: slip opinion, pp. 15-17.)

In the court of appeal appellant brought several claims of error relating to ineffective assistance of counsel, including counsel's failure to object to the prosecutor's introduction of expert testimony on rape trauma syndrome as substantive evidence of appellant's guilt. As the opinion recognizes, appellant brought a concurrent petition for writ of habeas corpus on this issue and included a declaration from counsel. In that declaration counsel stated she did not object to the prosecutor's malfeasance in this regard because objecting to the improper testimony only would have drawn more juror attention to it. Such an assertion might have had some validity if what had been involved were one or two quick questions or a fleeting reference by the prosecutions expert. Instead, what happened at appellant trial was that the prosecutor asked extremely detailed question of its rape trauma syndrome expert which filled three full pages of reporters transcript. As stated in the writ, these questions was very long-winded and minutely detailed to precisely reflect the factual scenario advocated by the prosecution, the victim's testimony. Defense counsel remained mutte throughout the entire ordeal and simply acceded to the prosecutors misconduct. When the trial court granted the prosecutor's in limine motion to introduce rape trauma syndrome evidence, it cautioned that (the witness would not be testifying about anything to do with the factual scenario here,) just in terms of generally how victims react. (1 RT 121.) However, the prosecutor did not obey this requirement. Morica Blackstock was the prosecution's expert. The surgical precision and detail of the prosecutor's questions of her could have left no doubt in the jurors minds that he was talking about this case, not

about general principles relating to the syndrome. (5 RT 959-962.)
California Supreme Court has made it crystal clear that expert testimony
concerning rape trauma syndrome is <u>not</u> admissible to prove that the
alleged victim was raped. (People V. Bledsoe (1984) 36 Cal. 3d 236, 251.)
It's only purpose is to serve to explain the physical, psychological and
emotional reactions which are common to rape victims. (Id. at pp 241-242,
fn. 4.) Expert witness testimony on rape trauma syndrome is limited to
discussion of victims as a class, supported by references to literature
and experience (such as an expert normally relies upon) and does not
extend to discussion and diagnosis of the witness in the case at hand.
(People V. Roscoe 1985) 168 Cal. App. 3d 1093, 1100, People V. Jeff (1988) 204
Cal. App. 3d 309, 331-332 [same true for child abuse accommodation syndrome
expert testimony].) The purpose of this limitation is to prevent the potential
misuse of the experts testimony by allowing the jury to believe the victim
has essentially been diagnosed with a syndrome that presupposes a rape occurred
(Strickland V. Washington (1984) 466 U.S. 668, 687. In this case the experts
testimony was entirely improper and at variance with the court's guidance.
The Court of Appeal rejected appellant's contention on the basis that the
evidence of appellant's guilt was overwhelming. This was an entirely
improper rationale, because the improper evidence complained of here was part
of that overwhelming evidence, and was especially pernicious because it came
in the guise of expert testimony. The experts testimony improperly invaded
the province of the jury. (see. Eze V. Senkowski (2ND Cir. 2003) 321 F.3d 110, 131.)
No conceivable valid reason could have impelled counsel's failure to object. object
Appellant was deprived of his six amendment right to the effective of assistance
of counsel and also to due process under the fourteenth amendment. This
court should grant this petition in order to reiterate its teaching on the
appropriate scope of expert testimony on rape trauma syndrome and do so

1    MR. BELTRAMO:  And I have no information that

2    there existed a prior relationship, sexual relationship,

3    between the two parties.  If the defense has any

4    information regarding that, aside from the client's own

5    statements about that, I would ask that it be turned

6    over.

7    THE COURT:  And do you have a position as to

8    that?

9    MS. THOMAS:  I think that's already been

10   addressed if I have additional reports or interviews

11   under Rowland.

12   THE COURT:  Okay.  No. 11, rape trauma

13   syndrome.

14   I'm assuming, just so we are clear on this, what

15   you would be calling this witness for is not to provide

16   any evidence about the factual scenario that's alleged

17   in this case, but about the subject of the syndrome,

18   which basically looks at it from a whole different point

19   of view; that you start out from the perception that

20   something did happen, and you try to look at it to see

21   how people in general react to this kind of an offense.

22   That the witness would not be testifying about

23   anything to do with the factual scenario here, just in

24   terms of generally how victims react.

25   MR. BELTRAMO:  That's correct.

26   THE COURT:  And there is some specific

27   instructions on that.

28   Do you wish to be heard on that?

1  Q.    And some people cry.

2  A.    Yes.

3  Q.    I'd like to ask you some hypotheticals and ask

4  you if these hypotheticals -- I will stop on occasion

5  and ask you if this behavior of a victim is consistent

6  with your experience and expertise in the areas of

7  sexual assault and rape trauma syndrome.

8  A.    Okay.

9  Q.    If you have an experience, hypothetically, where

10 an individual is on a bus late at night, a woman, young

11 woman, and someone boards the bus who she is familiar

12 with, she's seen on occasion before, and they sit right

13 next to her, even though there is empty spaces around

14 the bus, and she feels uncomfortable by that situation

15 but is not unduly scared at this point;

16       The bus stops and she gets off that bus, and that

17 person, the assailant, follows her off the bus shortly

18 after, and follows her down the street;

19       And she still feels uncomfortable about it, but

20 she's giving him the benefit the doubt, maybe he lives

21 nearby and maybe he lives around the corner; is that

22 irregular or abnormal behavior?

23 A.    No, I think it's very normal.  I think that it's

24 very, very common, especially for women, to have

25 uncomfortable feelings, and to try really hard to talk

26 ourselves out of them because they feel like we are

27 overreacting or don't want to cause a scene or embarrass

28 someone, especially ourselves.

GERALD A. DOHRMANN, C.S.R.#2046

1       And that's a denial I was talking about in the
2  beginning.
3       So, we go over and over and over and above and
4  beyond to give the person the benefit of the doubt until
5  we get it, and then our options for fight or flight are
6  usually gone.
7  Q.     To continue with the hypothetical, then:  If the
8  victim continues to have the assailant -- not have --
9  but the assailant continues to walk with the victim at
10 very close range late at night, and at some point the
11 victim stops and says she is going home and the
12 assailant grabs her around the neck and body, drags her
13 from a number of feet into a park, and then forces her
14 down into a secluded area of the park, or a darkened
15 area of the park, and then forces her on the ground.
16      And the victim at this point is told to take off
17 her clothes.  Removes her shoes.  And then seeing an
18 opportunity to flee, tries to flee before she is either
19 tripped by the assailant, somehow trips on her own, but
20 is thrown to the ground and tackled and has the
21 assailant's hands around his neck -- her neck.
22      And at that point, after being hit and choked,
23 she gives up with her ankle sprained, fractured; is this
24 compliance after that series of actions abnormal or
25 irregular?
26 A.     Absolutely not abnormal.  That's a prime example
27 of trying something, and when it doesn't work, you
28 switch gears.  And complying is not consenting.

1  Complying is doing what you have to do to stay alive,

2  and that's the most common reaction.

3  Q.    This complying in this hypothetical, would it

4  change your opinion if the assailant, though physically

5  forcing her to do all of these things -- choking her,

6  hitting her, forcing her to the ground, didn't have a

7  weapon -- would that change your assessment?

8  A.    Bodies can be weapons.  And it sounds like in

9  this story that you are telling that this person was

10  stronger than the victim and already able to do harm.

11  That's weapon enough.

12  Q.    If the assailant then physically forces himself

13  upon the victim, rapes her; and then talks to her after

14  the rape occurs, talks to her for a certain length of

15  time; leads her to another area in the play structure of

16  the park, and tells her to get on the ground where he

17  rapes her again; and then talks to her again for a

18  length of time, and at this point the victim realizes

19  that she needs to talk back to him, and so she does, she

20  talks to him about her background, about her life, with

21  her hopes about her future, is that behavior uncommon or

22  irregular?

23  A.    No, it is not uncommon.  I think that's actually

24  another good example of what I said earlier, that it

25  sounds like it was an effort to become more human or

26  touch the human side of the offender, to probably work

27  at getting the assault to stop.

28  Q.    If the victim is then raped by her assailant

1    again for a period of time; and then again talked to and
2    raped again, finally; and then the assailant leads the
3    victim out, helps her out because of her fractured
4    ankle, helps her out of the park, helps her down the
5    street to where he at first accosted her, is this -- in
6    that hypothetical, the type of behavior that we were
7    talking about where you have a rapist that forced
8    himself violently upon the woman and then feign or
9    pretend somehow to -- delusionally pretend to be kind to
10   them, is that the behavior that you are talking about in
11   the victim responding to try to humanize themselves?
12   A.     Yes.
13   Q.     If after this, these assaults, the victim hobbles
14   home and reports; and subsequently, after she's treated,
15   takes herself out of her normal social routine, she
16   withdraws, she moves to another location while she was a
17   very happy, energetic person, she doesn't want to
18   socialize with anyone, she doesn't want to go to school,
19   she defers from going to a school, college she was
20   accepted to, she doesn't want to see men, even family
21   members at times, she has difficulty being alone, is
22   that irregular or abnormal behavior?
23   A.     Very, very normal behavior.
24   Q.     And why is that?
25   A.     It -- it goes to, once again, what I was saying
26   earlier about the need to feel safe and to appear to be
27   okay, and convince yourself that you are safe and okay.
28          And quite often, most often the way we do that is

GERALD A. DOHRMANN, C.S.R.#2046

in the context of counsel's duty to his client. (Strickland, supra 466 U.S. at pp. 687-688) (Anderson, supra, 25 Cal. 4th at p. 569.) (see Moore v. Parke (7th Cir. 1998) 148 F. 3d 705.)

     5.) The court violated appellant's Fifth amendment right against self-incrimination when it instructed the jury to speculate about his silence and construe his silence against him. (Herein of Caljic no. 2.62.) (Ref: slip opinion, pp. 17-18.)

Before appellant testified, his counsel advised the court that she would not be asking him any questions about the Minoko Doe incident which the prosecution introduced under evidence code section 1108 and 1101. She also asked the court to preclude the prosecutor from cross-examining him on that matter, pointing out that he never was charged with anything relating to it. The court acknowledged that appellant was still subject to possible prosecution for criminal offenses arising out of that incident. (6 RT 1269-1273.) Ultimately, the court denied appellant's request and ruled that the prosecutor could ask questions about the incident notwithstanding that appellant was never charged in it, but might so be charged. (6 RT 1277-1280.) On the witness stand, appellant presented his version of the facts relating to the offenses for which he is on trial. However, he duly asserted his Fifth amendment right to silence in response to the prosecutor's questions about the Monako Doe matter as being entirely collateral to this trial. At the jury instruction conference, the court then denied his request not to instruct the jury with Caljic No. 2.62. The jury instruction. (2 CT 361, 7 RT 1462.) In closing argument the prosecutor hammered away at appellant's refusal to answer questions in this case, (7 RT 1521-1522) specifically referring to Caljic No. 2.62. In the court of appeal, appellant asserted that the giving of Caljic No. 2.62 coupled with the prosecutor's

(33)

argument in the face of the court's ruling permitting evidence about the Monako Doe incident violated his fifth amendment right against self-incrimination. Because appellant declined to answer questions directed at separate uncontested crimes, the court effectively instructed the jury that it could infer that his answers would have been incriminatory and to speculate as to his reasons for refusing to answer. At the same time, the court recognized that Caljic No. 2.62 has been and had a rocky history and should be given sparingly, see (Slip opinion, pg. 18.) More so, a defendant who testifies may be cross-examined and impeached with evidence merely affecting credibility if that evidence is not within the privilege against self-incrimination and if it does not incriminate him with other punishable crimes. For example, the use of prior felony convictions for purpose of impeachment does not implicate the privilege against self-incrimination because the defendant has already suffered the conviction. This has long been the practice in our courts. In the case of a criminal defendant, the scope of cross-examination of him is limited in order to avoid the confusion which may attend the trial of collateral issues or unfairness to the defendant. In the federal jurisdiction, it is error to inquire about details of prior criminal conduct even despite no objection by trial counsel. (United States V. Dow (7th Cir. 1972) 457 F.2d 246, 250.) The trial court gave unwarranted respectability to this evidence. The error in giving the instruction was prejudicial because it relieved or detracted from the prosecutions burden of proving appellant guilty beyond a reasonable doubt. As such, it transgressed the fundamental principles rights to due process and a fair trial. (U.S. Const, Amends. 5, 6, 14; Calif. Const, art 1, 15, 16.) The net effect of the improper instructions and prosecutorial argument was to tell the jury it could infer guilt from silence, in violation of Griffin V. California (1965) 380 U.S. 609; (People V. Tealer, supra, 48 Cal. App. 3d at p. 604) I recognize a reasonable possibility that the procedures I have criticized

might have contributed to the conviction. (Fahy V. Connecticut (1963) 375 U.S. 85, 86-87; (Chapman V. California, supra, 386 U.S. at p. 24.) Appellant constitutional rights under the fifth amendment were abridged. In fact, this instruction compounded the court's mistaken in permitting the improper cross-examination.

CALJIC No. 2.62 has long been the subject of severe criticism. (See e.g., People. V. Haynes (1983) 148 Cal. App. 3d 1117, 1119 [noting the hostile reception to CALJIC No. 2.62].) It has been urged that trial judges exercise extreme restraint in giving the instruction in its present form. (People V. Saddler (1979) 24 Cal. 3rd 671, 685 [Bird, C.J., conc.].) In fact, many courts have found that CALJIC No. 2.62 was improperly given. (See People V. Lamer (2003) 110 Cal. App. 4th 1463, 1470, fn. 4, listing a number of published cases which reached this conclusion.) Appellant expressly objected to this instruction (7 RT 1437), and it should not have been given. CALJIC No. 2.62 is unwarranted when a defendant explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear. (People V. Lamer, supra, 110 Cal. App. 4th at p. 1469, quoting People V. Kondor (1988) 200 Cal. App. 3d 52, 57) Here, appellant did not fail to explain or deny facts with in his knowledge. His version of the events was simply at variance with that of the victim. Appellant testified that there was one act of vaginal intercourse - with Chanelle, his old girlfriend - and that was consensual. In addition, Evidence Code section 413, upon which 2.62 is based, states only that the trier of fact may consider a testifying party's failure to explain or deny evidence against him or her, leaving to the jury what inference, if any, to draw therefrom. CALJIC No. 2.62 improperly goes much farther, directing the jury _how_ to use this evidence, and specifically stating that the reasonable inferences are those which are more unfavorable to the defendant as the more probable. The instruction also singles out for special scrutiny only the defendant's testimony. The trial court alluded to the Fifth Amendment problem and deferred ruling. (5 RT 1140-1142.)

(See People V. Saddler, supra, 24 Cal. 3d 671, 685.)

The jury received the Mayberry instruction of CALJIC NO. 10.65.
(2 CT 380; 7 RT 1473.)

Evidence Code section 413 provides:

In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case.

Another problem with CALJIC NO. 2.62 is that it permits the jury to consider a defendant's supposed failure to explain or deny any evidence. In this case, the prosecution's transparent objective in seeking this instruction was only to cast doubt on appellant's testimony.

However, the error in giving the instruction was prejudicial.

## _ CONCLUSION _

Petitioner Smiley, Fifth, Sixth, and Fourteenth Amendment Rights of the United States Constitution was violated. Wherefore, petitioner prays that this court grant his Petition For Writ Of Habeas Corpus.

Respectfully Submitted,

Derran Smiley, Petitioner

Date:

1  next to if not exactly nothing, but what it may wind up,

2  I started looking to get some authority under 2.62 that

3  talks about the jury instruction that talks about a

4  defendant's failure to explain matters which in logic he

5  should explain and what inferences can be drawn from

6  that.   Reference to Minako Doe.

7       So, that's what I sort of got during that 15

8  minutes.   It's not like we had a lot of time to look it

9  up.

10          MR. BELTRAMO:  No.

11          MS. THOMAS:  So, it just remains to be seen.

12  I would ask to relook at this tomorrow after going over

13  these authorities and see whether the proper procedure

14  is putting him on the stand out of the presence of the

15  jury and let him take the Fifth there.

16       I think the only event factually that's different

17  is that the District Attorney has already threatened

18  prosecution on the Doe case, the Minako Doe case.  Said

19  he may well charge it.  In view of that, my advice to my

20  client would have to be --

21          THE COURT:  Yeah.  And mine probably.  I'm not

22  giving you any advice, but mine probably would under

23  those circumstances, too.  But to be able to get up here

24  and just pass that off, as indicated by Mr. Beltramo, my

25  understanding is that once you take the stand and start

26  testifying in your own behalf, you subject yourself to

27  any kind of cross-examination, no matter how much harm

28  it can do to you, even as to collateral matters.

1    Now, whether or not what happens when he takes

2   the Fifth, should he take the Fifth, I don't want to

3   prejudge what I'm going to do, but I'm telling you of an

4   alternative that I have thought of that's come to my

5   attention since we talked about it, and that is, I don't

6   think the threat, if you will, of a civil contempt is

7   worth much of anything; on the other hand, you don't

8   want to allow -- if he is required to answer questions

9   because he's put his credibility into issue, and it does

10  appear to me that there is a similarity of circumstances

11  here, particularly as to Minako, to cut that off will

12  without incurring some kind of penalty for that.  And

13  jury instruction 2.62 is one such penalty.

14          MS. THOMAS:  I understand.

15          THE COURT:  So, if you will come at 9:00

16  o'clock tomorrow, I will be here and be glad to answer

17  any question.  I will be glad to take a quick look at

18  the cases.  And I have written down the cite on Smith

19  and Cooper, and I will take a look at those before I

20  leave tonight.

21          MR. BELTRAMO:  In terms of the waiver of Fifth

22  Amendment right, Your Honor, it sounds like perhaps the

23  other two cases deal with it, as well, but for the

24  court's review, I would like to cite two others.

25          THE COURT:  Go ahead.

26          MR. BELTRAMO:  That's People vs. Barnum,

27  B-a-r-n-u-m, I don't know if it's the same spelling as

28  Barnum and Bailey, 29 Cal.4th 1210, and that can be

GERALD A. DOHRMANN, C.S.R.#2046

1 | found at 1226 in footnote 3.

2 |       THE COURT:  This sounds like Mr. Rubin again.

3 |       MR. BELTRAMO:  And People vs. Stanfield,

4 | that's at 184 Cal.App.3d 577, and at 581, stating again:

5 |            "Defendant who takes the stand

6 |            waives the privilege against self-

7 |            incrimination to the extent of all

8 |            inquiries which would appear proper

9 |            on cross.  Thus, the defendant

10 |           waives the privilege with respect to

11 |           any matter to which he expressly or

12 |           impliedly on direct examination and

13 |           that is relevant to impeach his

14 |           credibility as a witness."

15 |      THE COURT:  I think that's a statement of the

16 | law that even goes back to these federal cases from

17 | 1967.

18 |      MR. BELTRAMO:  Yes.

19 |      THE COURT:  So, Ms. Thomas, I will read these

20 | tonight, and you have been given them.  Let's see if you

21 | have anything to add.

22 |      MS. THOMAS:  Okay.

23 |      THE COURT:  Anything else tonight?

24 |      MR. BELTRAMO:  No.

25 |      THE COURT:  Recess.

26 |      (Whereupon, the evening recess was taken)

27 |                 ---o0o---

28 |

1272

1        **TUESDAY, MARCH 14, 2006**

2                    ---o0o---

3              **- P R O C E E D I N G S -**

4                    ---o0o---

5        (Whereupon, the following proceedings were had in

6   open court without the presence of the jury)

7        THE COURT:  On the record in the Smiley

8   matter.  Mr. Smiley is present as are both counsel.

9        It's 9:20 and the jury has not yet buzzed.  One

10  of the issues that we left yesterday involved the

11  prosecution's ability, if you will, to cross-examine the

12  defendant on the Minako Doe incident, since he didn't

13  testify about it on direct.

14        I did a little more research on it at the close

15  of business last night and found one other case in

16  Cal.3d that seemed to address not the exact point but

17  certainly the law involved.

18        And, Ms. Thomas, I know you were hit with it --

19  well, perhaps not, since you may have had some idea what

20  the testimony was going to be.  But, in any event, you

21  had last night to look up any cases you wanted the court

22  to look at.  Did you?

23        MS. THOMAS:  No, I guess it was Perez, and I

24  think that those cases are close to the point at issue.

25  But I think there are some facts that I didn't see in

26  those two cases that I think should be put forth.  And

27  when we were having preliminary discussions concerning

28  the kinds of 1108 evidence that might be put forth by

GERALD A. DOHRMANN, C.S.R.#2046

1273

1  the prosecution in this case, it was not on the record,

2  but the District Attorney said that, as far as Minako

3  Doe, he was not certain that the District Attorney's

4  office would pay to fly her back simply to be an 1108

5  witness; that they would fly her back to charge a new

6  case.

7         Ms. Minako Doe was brought forth and put on the

8  stand.  She was flown back from Japan at the expense, I

9  assume, of the District Attorney's office and put up at

10  the expense of the District Attorney's office.

11         THE COURT:  Well, you may be assuming facts

12  not in evidence.

13         MS. THOMAS:  I expect that, in view of that, I

14  think a charge against Mr. Smiley based on Minako Doe is

15  imminent, if not in the process of being filed.

16         THE COURT:  It certainly is possible.

17         MS. THOMAS:  The statute of limitations has

18  not run.  So, it's very possible.

19         THE COURT:  Absolutely.

20         MS. THOMAS:  Actually they may be in the

21  process of this being charged against him.

22         THE COURT:  My guess would be, just on my own

23  experience, that's probably not true.  It may be

24  considered after this trial is over, but my guess is, as

25  of right now, today, it's probably sitting off to the

26  side someplace waiting to see what happens here.

27         MS. THOMAS:  Precisely, waiting to see what

28  happens here.  And out of an abundance of caution, it

1277

1   issue about there being no criminal intent has been

2   raised by Mr. Smiley in his testimony.

3        In terms of whether or not he can be asked that,

4   these cases don't suggest one way or the other except by

5   inference.   In Thornton that's what happened.   The D.A.

6   asked questions and the defendant refused, perhaps by

7   saying, on the advice of counsel, "I refuse to answer

8   that question under the Fifth Amendment."

9        MS. THOMAS:   Well, I guess in this case I

10  would advise Mr. Smiley not to answer those questions.

11       THE COURT:   All right.   I'm going to let the

12  D.A. ask him.   I'm going to instruct the D.A. not to be

13  all morning with that kind of questioning.

14       And if you want to ask, you know, two, three,

15  five questions, fine, and then sum up with the fact

16  perhaps with a question:   Has your counsel advised you

17  not to discuss anything at all to do with the Minako Doe

18  incident?, just as a catchall kind of thing.

19       In other words, if you do too much of this, once

20  it's clear that he's not going to testify about that, if

21  that happens, I don't want to go on and on and on with

22  it.   Ask some questions and then ask a global kind of

23  question.

24       MR. BELTRAMO:   Okay.

25       THE COURT:   Just don't spend a whole lot of

26  time with it.

27       And it's fine with me if he says, "on the advice

28  of counsel", so it clearly comes from you.   That's what

1    you would prefer, I assume.

2         MS. THOMAS:  Yes.

3         MR. BELTRAMO:  But just to be clear, I don't

4    mind that language "on the advice of counsel," but he

5    has no Fifth Amendment right not to answer.  He's waived

6    his Fifth Amendment right.  Whether he chooses or

7    refuses to do so on the advice of counsel, that's fine,

8    but I don't want the jury to be given -- they would be

9    given the wrong idea if he was to say, "I have a Fifth

10   Amendment right not to answer.

11        THE COURT:  I think, if it was pertaining to

12   something to do with this case, you're right, But that's

13   sort of a collateral kind of issue.  And, as I say, this

14   happened in Thornton, and he took it, and the court at

15   760 in the footnote -- and apparently the judge there

16   allowed it on cross-examination, the defendant consist-

17   ently refused on Fifth Amendment grounds to testify

18   relative to the two other incidents.

19        So, I think certainly a person waives their Fifth

20   Amendment privilege in its entirety as opposed to the

21   crimes charged concerning the victim that you have here;

22   but as to other incidents, fuzzy area.

23        MR. BELTRAMO:  Okay.  I understand.

24        MS. THOMAS:  In not having read the case the

25   court just cited, the court did cite to a general denial

26   of the charges.  In this case, Mr. Smiley didn't deny

27   that the activity took place.  He just said that it was

28   consensual.

1    THE COURT:  That's true.  That's why I said
2  they are not a direct parallel here; because in that
3  case, in the Thornton case, the issue was I.D., and the
4  issue here as to Minako perhaps could be I.D., but I
5  don't know, and I'm not asking, because it's not my
6  business to know at this point.

7    But what they did state is that -- or what I'm
8  stating -- it appears to me that by saying, as he did,
9  that he had there either consent or he had a reasonable
10  belief and good-faith belief that the other person
11  voluntarily consented, that's now been put in issue.

12    And I think it's relevant that within three years
13  of that incident, under somewhat remarkably similar
14  circumstances:  Park, young woman.

15    So, I think I hope everybody has had their peace.
16  The issue is certainly preserved in my mind.

17    MR. BELTRAMO:  Yes.

18    THE COURT:  Okay.  So, are we ready to go
19  again?

20    MR. BELTRAMO:  Yes.

21    MS. THOMAS:  So, just to preserve the issue
22  for the record, Mr. Smiley is going to be able to say,
23  "I'm not going to answer on advice of counsel."  Do you
24  need an objection from me to the question?

25    THE COURT:  No, I think --

26    MS. THOMAS:  That's sufficient?

27    THE COURT:  -- if he words it that way, that's
28  sufficient, because I will advise Mr. Smiley that he has

```
 1   waived his privilege against self-incrimination as far
 2   as this case is concerned.
 3        And if that's your advice to him, he should stick
 4   with what he says.  Stay with that "On the advice of
 5   counsel, I'm not answering under the Fifth Amendment."
 6             MS. THOMAS:  Okay.
 7             THE COURT:  And I think the jury is probably
 8   going to be able to figure that out that says, no, he
 9   was never charged with that crime.
10             MS. THOMAS:  Okay.  Thank you.
11             THE COURT:  Everybody good to go?
12             MR. BELTRAMO:  Yes.
13             MS. THOMAS:  Yes.
14                        ---o0o---
15        (Whereupon, the following proceedings were had in
16   open court with the presence of the jury)
17             THE COURT:  Jurors and alternates have joined
18   us.
19        Good morning, everyone.
20        Mr. Smiley remains on the stand subject to the
21   same oath that he took yesterday.
22        Ready to resume cross-examination?
23             MR. BELTRAMO:  Yes.
24   Q.   Good morning, Mr. Smiley.
25   A.   Good morning.
26   Q.   Mr. Smiley, we left off yesterday talking briefly
27   about Michelea Doe and her rape.
28        I'm going to come back to that, but I'm going to
```

1   you to decide.

2          In this case the defendant has testified to

3   certain matters and has refused as to others.

4          With regard to the alleged incident involving

5   Minako Doe, if you find that the defendant failed to

6   explain or deny any evidence against him introduced by

7   the prosecution which he reasonably can be expected to

8   deny or explain because of facts within his knowledge,

9   you may take that failure into consideration as tending

10  to indicate the truth of this evidence and as indicating

11  that among the inferences that may reasonably be drawn

12  therefrom, those unfavorable to the defendant are the

13  more probable.

14         The failure of a defendant to deny or explain

15  evidence against him does not by itself warrant an

16  inference of guilt, nor does it relieve the prosecution

17  of its burden of proving every essential element of the

18  crime and the guilt of the defendant beyond a reasonable

19  doubt.

20         If a defendant does not have the knowledge that

21  he would need to deny or to explain evidence against

22  him, it would be unreasonable to draw an inference

23  unfavorable to him because of his failure to deny or

24  explain this evidence.

25         An admission is a statement made by the defendant

26  which does not by itself acknowledge his guilt of the

27  crimes for which the defendant is on trial, but which

28  statement tends to prove his guilt when considered with

1  it.

2      And, again, we all know, after having sat here

3  through trial, that while DNA between identical twins

4  may be the same, fingerprints are not.

5      They examined those prints.  They looked at both

6  Terran and Derran, and they determined that only

7  Derran's print were on the bottle.  They used the lab

8  prints and the other exemplars; but then we have yet to

9  come back in and verify with this man's own fingerprints

10 that they were using the same reference samples, that

11 they were using the correct reference samples for Derran

12 Smiley, and it confirms that only his prints are on that

13 bottle, because it's his sperm inside of Minako, because

14 he's the man that led her to that darkened place in the

15 park and raped her and beat her.

16     So, what's the defendant's explanation for all of

17 this?  What can he say about all of this?  With this

18 evidence in front of you, what can he say about it?

19 What explanation does he have?

20     He has none.  He refuses to answer questions

21 about it; refuses to answer questions in the face of

22 this evidence.

23     Why not answer questions if you didn't do it?

24 Why not answer questions if you are not the person that

25 commits these rapes?  If your brother is the one respon-

26 sible for Michelea?  If Chanelle consented?  If you're

27 not a rapist?  Why not answer questions?

28     He has no right to refuse to answer questions.

He has no Fifth Amendment protections when he hits that stand.  In other words, he can't say, "I have a right to silence."  You are not allowed to take the stand and say, "You know what?  I'm going to answer some questions, those that I have got a bit of a story for, those that I have rehearsed; but other questions, well, I'm just refusing to answer those."  You can't say that.

And so you will get this instruction, ladies and gentlemen.  It's CALJIC 2.62, and it's tailored specifically to the defendant's refusal to answer questions in this case.

With regard to the alleged incident involving Minako Doe, if you find the defendant failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you must take that -- you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that, among the inferences that may reasonably be drawn therefrom, those unfavor- able to the defendant are the more probable.

In other words, if he can't give you even an explanation or denial, you may assume he did it, because he did it.

So, in regard to Minako Doe, the fact that the man identified himself as Derran, what's the defendant's explanation?  He has none.

What about the fact that his DNA -- DNA matching

1    answer is no.

2         MR. BELTRAMO:  No.

3         MS. THOMAS:  You are also subject to cross-

4    examination about the 2001 on Minako Doe.  There may be

5    questions about that.  I can make objections, but I

6    don't believe at this point that -- Your Honor, he has

7    not been charged with anything with Minako Doe, and I'm

8    not sure that I would -- I would be asking him any

9    questions about that on direct for obvious reasons.

10        So, I would ask that the District Attorney be

11   advised not to go into the 2001 on Minako Doe.  We will

12   leave that out.

13        MR. BELTRAMO:  I believe that is being offered

14   directly to show that he committed that act and he has a

15   propensity.

16        THE COURT:  That's correct.  But if she

17   doesn't go into it on her examination of him, do you

18   believe you can still get into it?

19        MR. BELTRAMO:  Yes, because it goes to his

20   propensity to commit these crimes.  If he's saying he

21   has no propensity to commit these crimes --

22        THE COURT:  Isn't that somewhat akin to

23   exercising his right to remain silent?  That's something

24   that you need to research.  That's an interesting point.

25        Where she, obviously, there wouldn't be much

26   point in calling him to the stand if there weren't going

27   to be some issue about Chanelle Doe, the charged victim

28   here, but in terms of 1108, currently it was Minako and

1    Michelea -- we are talking about Minako now -- if the
2    evidence is not -- you presented what you presented.  If
3    she does not do anything on her direct of the defendant,
4    I don't think you get a free ride, that you can bring it
5    up on cross-examination.
6        That's something that you need to look into,
7    because you are not going to be able to convince me
8    right now.  But if you have a case that says -- my gut
9    reaction to that is wrong, but I certainly will be glad
10   to read it.  But, again, it's not going into a subject
11   matter.
12       MR. BELTRAMO:  I will research this.  It would
13   be one -- my position is that his propensity to commit
14   sexual acts is a subject matter she is going into by
15   virtue of him saying this was consensual, that "I didn't
16   commit these acts."  That's relevant to impeaching that
17   statement, his propensities.
18       THE COURT:  Go into that a little bit for me.
19       MR. BELTRAMO:  I will.
20       THE COURT:  I have never had that come up on
21   1108 before, and you obviously have thought about it
22   more than I have of.  At 20 minutes to 12:00 on the day
23   it's supposed to happen, I don't have that encyclopedic
24   knowledge of all of the cases that fall under 1108.
25   That's something that I will have to decide.
26       MR. BELTRAMO:  Okay.
27       MS. THOMAS:  And then the corollary would be,
28   if he could he take the Fifth?

1       MR. BELTRAMO:  If the court was -- I'd like

2  some time to look at this.

3       THE COURT:  All right.  But the corollary is

4  interestingly raised by Ms. Thomas:  If he says, "I want

5  to take the Fifth," you certainly can't force him to

6  testify about it, and, you know, you are not supposed to

7  be doing that in front of the jury, anyway.

8       I will look at it.

9       MR. BELTRAMO:  I will.

10       THE COURT:  So, we will deal with that issue

11  we come back.

12       Anything else?

13       MS. THOMAS:  No.

14       THE COURT:  Okay.  Do you have your jury

15  instructions with you now?

16       MR. BELTRAMO:  I do.

17       MS. THOMAS:  Yes.

18       THE COURT:  Let me just tell you -- and I'm

19  working off Mr. Beltramo's list at this point -- on the

20  first page, I have already printed all of them, but

21  1.23.1 -- and the reason I haven't printed that one yet

22  is, there is some variable language that may or may not

23  apply.

24       MR. BELTRAMO:  I'm sorry, Your Honor.  Which

25  one was this?

26       THE COURT:  1.23.1.

27       MR. BELTRAMO:  Okay.

28       THE COURT:  The bottom of page 1 there's some

STATE OF CALIFORNIA                               COUNTY OF MONTEREY

I, _Derran Smiley_ _____ declare under penalty of perjury that: I am

the _Petitioner_ _____ in the above entitled action; I have read the foregoing documents
and know the contents thereof and the same is true of my own knowledge, except as to matters
stated therein upon information, and belief, and as to those matters, I believe they are true.

Executed this _Thurs_ day of _August 14th_, 20_08_, at Salinas Valley State Prison,
Soledad, CA 93960-1050.

(Signature) _Derran Smiley_

DECLARANT/PRISONER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PROOF OF SERVICE BY MAIL

I, _Derran Smiley_ _____, am a resident of California State Prison, in the
County of Monterey, State of California; I am over the age of eighteen (18) years and am/am not a
party of the above entitled action. My state prison address is: P.O. Box 1050, Soledad, CA 93960-
1050.

On _August 14th_, 20_08_, I served the foregoing: _Petitioner Traverse_
_And Supporting Memorandum Of Law_

_____

_____

(Set forth exact title of document(s) served)

On the party(s) herein by placing a true copy(s) thereof, enclosed in sealed envelope(s), with postage
thereof fully paid, in the United States Mail, in a deposit box so provided at Salinas Valley State
Prison, Soledad, CA 93960-1050.

| | |
|---|---|
| Office Clerk, U.S District Court | Office of the Attorney General |
| Northern District Of California | 455 Golden Gate Avenue Suite 11000 |
| 280 South First Street, Room 2112 | San Francisco, California 94102-3664 |
| San Jose, California, 95113-3095 | |

(List parties served)

There is delivery service by United States Mail at the place so addressed, and/or there is regular
communication by mail between the place of mailing and the place so addressed.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: _August 14_, 20_08_                    _Derran Smiley_

Derr Smiley 
C-4/Cell #108
Salinas Valley State Prison
P.O. Box 1050
Soledad, CA 93960-1050

STATE PRISON
GENERATED MAIL
MAIL ONLY

Office Of The Clerk, U.S. District Court
Northern District Of California
280 South First Street, Room 2112
San Jose, California 95113-3095



8-14-08